Filed 10/3/16 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C072053 |
| v. | (Super. Ct. No. 11F00582) |
| ADAM CORNEJO et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion on rehearing filed September 6, 2016, in the above cause is modified as follows:

At the bottom of page 4, add the following three sentences to footnote 3, in the same paragraph:

And while defendants also assert such a confrontation violation would require reversal of their underlying convictions, as well as the gang enhancements, we disagree. The evidence establishing their guilt of the underlying crimes was very strong, as we explain more fully later in this opinion. Setting aside any testimonial hearsay conveyed to the jury through the gang expert, we would conclude beyond a reasonable doubt the jury would have convicted defendants of the underlying crimes.

1

This modification does not change the judgment.

The petition for rehearing is denied.

_____/s/_____
HULL, Acting P. J.

_____/s/_____
MURRAY, J.

_____/s/_____
HOCH, J.

Filed 9/6/16; on second rehearing (unmodified version)
<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ADAM CORNEJO et al.,<br><br>    Defendants and Appellants. | C072053<br><br>(Super. Ct. No. 11F00582)<br><br>OPINION ON REHEARING |

APPEAL from a judgment of the Superior Court of Sacramento County, Cheryl Chun Meegan, Judge. Affirmed in part and reversed in part with directions.

Audrey R. Chavez, under appointment by the Court of Appeal, for Defendant and Appellant Adam Cornejo; Eric Weaver, under appointment by the Court of Appeal, for Defendant and Appellant Jesse Cornejo; Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant Isaac Vasquez.

Kamala D. Harris, Attorney General, Dane R. Gillette, Michael P. Farrell, Assistant Attorneys General, Eric L. Christoffersen and Ivan P. Marrs, Deputy Attorneys General, for Plaintiff and Respondent.

1

Deandre Ellison was shot to death as he drove into his driveway in the Del Paso Heights neighborhood of Sacramento. Four other men, including Latrele Neal, were also in Ellison's car. Before the car came to a stop in the driveway, an SUV driven by Jesse Cornejo slowly drove past Ellison's house; the SUV's front and backseat passengers, Adam Cornejo and Isaac Vasquez, opened fire on Ellison's car.[1] Neal managed to return fire with Ellison's gun before the SUV drove away. About 20 bullets were exchanged between the vehicles. Bullets also struck Ellison's house. Ellison was the only casualty. After crashing the SUV while being pursued by law enforcement, Adam, Jesse, and Isaac were taken into custody a short time later. Each was a Norteño gang member. Isaac was 16 years old with a developmental disability; Adam and Jesse were 17 and 18 years old, respectively.

Adam, Jesse, and Isaac were tried together and convicted by jury of one count of second-degree murder (Pen. Code, § 187, Count One),[2] four counts of attempted murder (§§ 664/187, Counts Two, Three, Four, and Five), and one count of shooting at an inhabited dwelling (§ 246, Count Six). Jesse was also convicted of one count of driving in willful or wanton disregard for safety while fleeing from a pursuing peace officer. (Veh. Code, § 2800.2, subd. (a), Count Seven.) With respect to the murder, the jury found the offense was committed by means of shooting a firearm from a motor vehicle at another person outside the vehicle with the intent to inflict great bodily injury. (§ 190, subd. (d).) The jury also found the crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in any criminal conduct by gang members. (§ 186.22,

---

[1] Because Adam and Jesse Cornejo have the same last name, we refer to them by their first names; for consistency, we also refer to Isaac Vasquez by his first name.

[2] Undesignated statutory references are to the Penal Code.

subd. (b).)  Various firearm enhancement allegations were also found to be true. (§§ 12022.53, subds. (c), (d), (e)(1), 12022.5, subd. (a).)  The trial court sentenced Adam and Isaac to serve an aggregate indeterminate prison term of 120 years to life plus a consecutive determinate term of 9 years 4 months.  Jesse was sentenced to serve the same indeterminate term of 120 years to life plus a consecutive determinate term of 10 years.

Defendants appeal.  The following contentions are made by each defendant: (1) the evidence was insufficient to establish the "criminal street gang" requirement of the gang enhancements because there is no evidence Sacramento Norteño subsets are part of the larger Norteño organization; (2) the trial court prejudicially erred by allowing expert testimony that defendants probably fired first because Ellison would not have wanted to attract trouble to his home; (3) the trial court prejudicially erred and violated defendants' constitutional right to due process by excluding evidence they claim indicated Ellison had returned to a gang lifestyle, which they argue was critical to their self-defense claim; (4) the trial court prejudicially erred and further violated defendants' constitutional rights by providing the jury with a different instruction on causation than that contained in bracketed portions of CALCRIM No. 520; and (5) their respective abstracts of judgment must be modified to reflect the victim restitution order is a joint and several obligation.  Adam and Isaac also assert:  (6) the trial court's imposition of a sentence that is the functional equivalent of life without parole (LWOP) amounts to cruel and unusual punishment.  Finally, Isaac contends:  (7) the trial court prejudicially erred and violated his constitutional rights by allowing one of the detectives in the case to convey a misleading portion of Isaac's statement to police; and (8) the cumulative effect of the foregoing assertions of error requires reversal.

Following oral argument, our Supreme Court decided *People v. Prunty* (2015) 62 Cal.4th 59 (*Prunty*), which squarely addresses the first contention listed above.  We

3

requested supplemental briefing on the new case. Having reviewed this briefing, we conclude *Prunty* requires reversal of the gang enhancement findings (§ 186.22, subd. (b)) as to all defendants.**3** Also, because each defendant was found to qualify for vicarious firearm enhancements under section 12022.53, subdivision (e)(1), which requires violation of section 186.22, subdivision (b), as an element of that enhancement, we must reverse these vicarious firearm enhancements as to all defendants as well.

We disagree with the remaining above-listed contentions raised by all defendants, except for the conceded point that their respective abstracts of judgment should reflect the victim restitution order is a joint and several obligation. Specifically, the trial court did not err by allowing expert testimony that defendants probably fired first because Ellison would not have wanted to attract trouble to his home. Defendants' contention that the trial court prejudicially erred and violated their constitutional right to due process by excluding evidence of Ellison's return to an active gang lifestyle is forfeited. Nor were their respective counsel ineffective for failing to preserve the issue for review. We also reject defendants' claim the trial court prejudicially erred and violated their constitutional rights by providing the jury with a different instruction on causation than that contained in a bracketed portion of CALCRIM No. 520. While the instruction provided was erroneous in two respects, the error was harmless.

---

**3**     This conclusion makes it unnecessary to address defendants' additional, and arguably meritorious, assertion that the trial court prejudicially erred and violated their constitutional right of confrontation by admitting expert gang testimony concerning the basis for the expert's conclusions they were active Norteño gang members. (See *People v. Sanchez* (2016) 63 Cal.4th 665, 670-671 ["case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay" and "[s]ome of those hearsay statements were also testimonial and therefore should have been excluded under *Crawford*[ *v. Washington* (2004) 541 U.S. 36]"].)

Turning to the Eighth Amendment claim raised by Adam and Isaac, we concluded in our original opinion that remand for a new sentencing hearing was required because it was unclear whether the trial court properly considered all mitigating circumstances attendant in each juvenile offender's life, including but not limited to chronological age at the time of the crime and physical and mental development, before sentencing them to serve the functional equivalent of life without parole (LWOP). In so concluding, we rejected the Attorney General's argument Senate Bill No. 260 (2013-2014 Reg. Sess.) (SB 260)), which became effective January 1, 2014, rendered resentencing unnecessary because, under newly-enacted section 3051, Adam and Isaac will be afforded a meaningful opportunity for parole "during [their] 25th year of incarceration" (§ 3051, subd. (b)(3)), i.e., within their natural life expectancies. We granted rehearing on this issue in light of certain language contained in *Montgomery v. Louisiana* (2016) 577 U.S. ___ [136 S.Ct. 718] (*Montgomery*), decided after our decision was issued. After receiving supplemental briefing on the import of *Montgomery*, we issued an opinion on rehearing that again concluded there was an Eighth Amendment violation for which remand was required.[4] The day after we issued the opinion on rehearing, our Supreme Court decided *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), which prompted us to again grant rehearing and again accept supplemental briefing on the new authority. Based on *Franklin*, we now conclude the Eighth Amendment claim is moot. Moreover, based on the procedural context of this case, we need not order the limited remand that was ordered in *Franklin*.

Finally, the remaining claims brought by Isaac alone also fail. The trial court did not prejudicially err or violate his constitutional rights by allowing one of the detectives

---

**4**    Justice Murray dissented from both the initial opinion and the opinion on rehearing.

5

to convey a portion of his statement to police. Nor does the cumulative effect of the foregoing assertions of error require reversal.

Accordingly, with respect to each defendant, we shall reverse the gang enhancement and vicarious firearm enhancement findings, modify the judgments to strike these enhancements, and affirm the modified judgments. We shall also direct the trial court to amend the abstracts of judgment to reflect the modifications and to indicate the victim restitution order is a joint and several obligation.

FACTS

On the afternoon of January 19, 2011, Ellison left his home to go to the store. He drove his wife's Ford Taurus and brought along three other men, including Neal, who sat in the back of the car directly behind Ellison. On the way to the store, Ellison picked up another man, who was walking to Ellison's house, and then continued on to the store. Ellison, a former gang member, had a .40-caliber handgun in the car's center console. According to his wife, he bought the gun for protection. Having recently testified against another gang member in exchange for being released from jail, Ellison had received threats and was concerned about retaliation for being a "snitch." Neal was aware of the threats. He was also aware Ellison had a gun in the center console.

When Ellison and his companions returned from the store, they turned onto Ellison's street and noticed two vehicles approaching from the opposite direction. The first vehicle was a small car. The second vehicle was a Ford Explorer containing the defendants in this case. In order to pull into his driveway, which was on the left side of the street, Ellison turned between the two vehicles. Around this time, Neal noticed the occupants of the Explorer were giving them "hard looks" and said: "[W]ho is them muggin' us?" Before Ellison was able to put the car in park, Neal opened his door and started to step out to "figure out who was in them cars." As he did so, the Explorer

6

stopped in front of Ellison's house and the front and backseat passengers, Adam and Isaac, opened fire with semi-automatic handguns.

Neal managed to "jump back in the car" before the first shots were fired. Multiple bullets struck the Taurus, shattering the rear window. When someone in the car said, "shoot back," Neal grabbed Ellison's handgun from the center console, fired one round through the "busted out" back window, and then got out of the car and continued firing at the Explorer until he "couldn't shoot no more." Neal fired at least six rounds. However, it does not appear any of Neal's shots struck the Explorer. Shots fired by Adam and Isaac were far more accurate. Combined, they fired at least 14 rounds, hitting both the Taurus and Ellison's home multiple times. One bullet struck Ellison in the upper back as he leaned forward in the driver's seat, traveled through his neck and head, and lodged in his brain. Death from this gunshot wound came within a matter of minutes.

After Adam and Isaac finished firing upon Ellison and his companions, the Explorer drove away. The Taurus's remaining passengers got out of the car. Neal "took off running" with Ellison's gun because he was afraid of being arrested for being a felon in possession of a firearm. Ellison's wife, Jettiemarie Boyd, who witnessed the shooting from outside her neighbor's home, ran to her husband. During the shooting, the Taurus had continued forward into the garage door. The tires were still spinning when Boyd reached the car. She put the car in park, removed the keys from the ignition, and tended to her husband. Boyd's mother and various neighbors also came out to check on Ellison, who was "slumped over the steering wheel" with "blood . . . coming out of his neck, running down his chest." He died before law enforcement and medical personnel arrived on the scene.

A description of the Explorer and the shooters was given to police at the scene and relayed over the radio to nearby patrol cars. The vehicle was located a short time later, not far from the crime scene. When a traffic stop was initiated, Jesse led officers on a

high-speed chase, reaching speeds of 85 miles per hour, before crashing the Explorer in an intersection. Defendants then attempted to flee on foot; each was taken into custody. During the chase, two handguns were thrown from the Explorer. Police recovered a 10-millimeter handgun along the chase route. Eight 10-millimeter casings found at the scene appeared to have been fired by this gun. A magazine for a 9-millimeter handgun and several unfired 9-millimeter rounds were also recovered along the chase route. The gun associated with the magazine and bullets was not recovered. However, Isaac admitted to police that a 9-millimeter handgun was also thrown from the vehicle and two 9-millimeter casings found in the Explorer appeared to have been fired by the same gun that fired six such casings found at the scene of the crime. Gunshot residue tests also corroborated the fact that Adam and Isaac were the shooters, while Jesse drove the Explorer.

Finally, the prosecution provided testimony from an expert on criminal street gangs, Detective John Sample, who testified Jesse, Adam, and Isaac were each active members of the Norteño street gang, and a hypothetical shooting based on the facts of this case would have been committed in association with or for the benefit of the gang. We provide a more detailed description of Detective Sample's testimony in the discussion that follows.

DISCUSSION

We first address those contentions asserted by all three defendants. Then, we address one claim raised by both Adam and Isaac. Finally, we address Isaac's remaining contentions.

8

## I

### *Sufficiency of the Gang Evidence*

Defendants contend the evidence was insufficient to support the jury's finding they committed the charged offenses "for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)) because the required predicate offenses the gang expert testified about were committed by members of Norteño subsets that were different than the subsets to which defendants belonged and there was no substantial evidence linking these subsets to each other or to the greater Norteño gang.  We agree.

Section 186.22, subdivision (b), increases punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."

"To establish that a group is a criminal street gang within the meaning of the statute, the People must prove:  (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity.  [Citations.]"  (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457; § 186.22, subd. (f) (Section 186.22(f)).)  "A 'pattern of criminal gang activity' is defined as gang members' individual or collective 'commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more' enumerated 'predicate offenses' during a statutorily defined time period.  [Citations.]  The predicate offenses must have been committed on separate

occasions, or by two or more persons. [Citations.]" (*Duran*, *supra*, 97 Cal.App.4th at p. 1457; § 186.22, subd. (e); *People v. Loeun* (1997) 17 Cal.4th 1, 9-10.)

To satisfy these "criminal street gang" requirements, Detective Sample testified there were about 1,500 Norteño gang members in the Sacramento area. He had personally contacted about 150 such gang members. The detective testified their commonly used symbols are "the letter N, anything that is representative of the number 14 -- N is the 14th letter of the alphabet -- the Roman numerals XIV, which is the number 14 in Roman numerals, a one dot and a four dot. Typically their primary color is red. They use the Huelga bird as one of their primary symbols, which was taken from the United Farmworkers." He further testified their primary activities include "[a]ssaults with firearms, stabbings, homicides, narcotics trafficking, burglaries, robberies, stealing cars." Finally, the detective testified regarding the facts of two predicate offenses committed by gang members belonging to two different Norteño subsets. The first predicate offense involved three Norteño gang members who belonged to the Varrio Centro subset, a "click that's in downtown Sacramento," one of whom fired upon a car being driven by a person he "had problems with in the past" while another threw two beer bottles at the car. The other predicate offense involved four Norteño gang members who belonged to the Varrio Gardenland subset, one of whom pulled out a handgun during a fight with a rival group of Norteños and shot three people, killing one. However, while there is more than sufficient evidence establishing the defendants in this case are Norteño gang members, they did not belong to the specific subsets whose members perpetrated the predicate offenses. Instead, Adam and Jesse belonged to the Oak Park subset, while Isaac belonged to the Varrio Franklin Boulevard subset. Detective Sample testified Norteño subsets adhere to the same structure, have the same beliefs, and claim membership in the overarching Norteño gang.

10

We are compelled by our Supreme Court's recent decision in *Prunty*, *supra*, 62 Cal.4th 59, to conclude the foregoing evidence was not sufficient to support the gang enhancements. There, as here, the prosecution's gang expert testified to two predicate offenses committed by members of two Norteño subsets, neither of which was the same subset to which the defendant belonged.[5] The only evidence indicating these subsets "identified with a larger Norteño group" was the expert's testimony that they all "referred to themselves as Norteños." (*Id.* at p. 69.) This, the court held, was not enough to show the Norteño gang the defendant sought to benefit by committing his crimes was the same Norteño gang that committed the predicate offenses. (*Id.* at pp. 75-76, 81-82.) Instead, the prosecution was required to prove "some associational or organizational connection uniting those subsets." (*Id.* at p. 71.) The court continued: "That connection may take the form of evidence of collaboration or organization, or the sharing of material information among the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization. [¶] Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same 'group' that meets the definition of section 186.22(f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22[, subdivision] (b)." (*Id.* at pp. 71-72, fns. omitted.)

---

[5]     Detective Sample was also the expert in *Prunty*. He testified about the same two predicate offenses there as he did in this case. (*Prunty*, *supra*, 62 Cal.4th at p. 69.)

11

Here, as in *Prunty*, the evidence falls short of establishing an associational or organizational connection between the Norteño subsets who committed the predicate offenses, i.e., the Varrio Centro Norteños and the Varrio Gardenland Norteños, and the Norteño subsets to which defendants belonged, i.e., the Oak Park Norteños and the Varrio Franklin Boulevard Norteños. As in *Prunty*, Detective Sample "did not describe any evidence tending to show collaboration, association, direct contact, or any other sort of relationship among any of the subsets he described. None of his testimony indicated that any of the alleged subsets had shared information, defended the same turf, had members commonly present in the same vicinity, or otherwise behaved in a manner that permitted the inference of an associational or organizational connection among the subsets." (*Prunty*, *supra*, 62 Cal.4th at p. 82.)

With respect to showing a connection between the various subsets and the larger Norteño gang, the question becomes closer. As the Attorney General points out, Detective Sample testified Norteño subsets adhere to the same structure, have the same beliefs, and claim membership in the larger Norteño gang. However, the detective did not testify as to what that purported structure was, or that it was somehow imposed upon the subsets by the larger Norteño organization. (See, e.g., *Prunty*, *supra*, 62 Cal.4th at p. 77 ["straightforward cases might involve subsets connected through formal ways, such as shared bylaws or organizational arrangements"; "proof that different Norteño subsets are governed by the same 'bylaws' may suggest that they function—however informally—within a single hierarchical gang"].) Nor is the fact subsets share the same beliefs sufficient to establish the associational connection required by *Prunty*. Instead, as our Supreme Court explained, "subsets of a criminal street gang must be united by their *activities*, not simply by their viewpoints." (*Id*. at p. 75, italics added.)

Finally, Detective Sample's testimony that Norteño subsets claim membership in the larger Norteño gang does not suffice to establish the requisite connection. As our

12

Supreme Court explained: "[T]here are some limits on the boundaries of an identity-based theory. The evidence must demonstrate that an organizational or associational connection exists in fact, not merely that a local subset has represented itself as an affiliate of what the prosecution asserts is a larger organization. [Citation.] Although evidence of self-identification with the larger organization may be relevant, the central question remains whether the groups in fact constitute the same 'criminal street gang.' In making the required showing, moreover, the prosecution must do more than simply present evidence that various alleged gang subsets are found within the same broad geographic area. For instance, that the various alleged gang subsets in this case were located 'all over Sacramento' does not show that the subsets constituted a single criminal street gang. The prosecution must introduce evidence of the alleged subsets' *activities*, showing a shared identity that warrants treating them as a single group. Such evidence could come in the form of proof that a certain Norteño subset retaliates against a Sureño gang for affronts that gang has committed against other Norteño subsets. Behavior of this kind could suggest that members of the Norteño subset consider themselves to be part of a larger association. Or, the prosecution could introduce evidence showing that different subsets require their members to perform the same initiation activities. Evidence of this common behavior may be some evidence that members identify themselves as belonging to the same gang. The key is for the prosecution to present evidence supporting a fact finder's reasonable conclusion that multiple subsets are *acting* as a single 'organization, association, or group.' (§ 186.22(f).) Evidence of self-identification must refer to the particular *activities* of subsets, and must permit the jury to reasonably conclude that the various subsets are associated with each other because of their shared connection with a certain group. And where, as in this case, the alleged perpetrators of the predicate crimes under section 186.22(f) are members of particular subsets, the *behavior* of those subsets' members must connect them to the gang the

13

defendant sought to benefit." (*Prunty*, *supra*, 62 Cal.4th at pp. 79-80, italics added.) Thus, what is required is proof "various subset members exhibit *behavior* showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization." (*Id*. at p. 71, italics added.)

Here, as in *Prunty*, while there was ample evidence defendants self-identified as part of the larger Norteño gang and the Oak Park Norteños (Adam and Jesse's subset) collaborated with the Varrio Franklin Boulevard Norteños (Isaac's subset) to carry out the present offenses, Detective Sample "offered no evidence that . . . members [of the subsets who committed the predicate offenses] behaved in a manner that conveyed their identification with the larger association that [defendants] sought to benefit. Instead, Sample simply described the subsets by name, characterized them as Norteños, and testified as to the alleged predicate offenses. He offered no additional information *about their behavior* or practices that could reasonably lead the jury to conclude they shared an identity with a larger group. The jury was consequently left with no way to connect the subsets that committed the predicate offenses to the larger Norteño group the prosecution claimed [defendants] acted to benefit." (*Prunty*, *supra*, 62 Cal.4th at pp. 82-83, italics added, fn. omitted.)

We must therefore reverse the gang enhancement findings as to all defendants. Moreover, because each defendant was also found to qualify for vicarious firearm enhancements under section 12022.53, subdivision (e)(1), which requires violation of section 186.22, subdivision (b), as an element of that enhancement, we must also reverse these vicarious firearm enhancement findings as to all defendants. We note, however, Adam and Isaac were also found to have personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subd. (d)) during the commission of their crimes, independently qualifying them for the 25-years-to-life enhancement for each crime, which the trial court imposed at sentencing.

14

## II

### *Admission of Certain Opinion Evidence*

Defendants further assert the trial court prejudicially erred by allowing expert opinion testimony that defendants probably fired first because Ellison would not have wanted to "attract trouble" to his home. Not so.

### A.

### *Additional Background*

Detective Jason Kirtlan interviewed Neal in the presence of Neal's attorney, who had secured an immunity agreement for Neal prior to the interview. During his cross-examination of Detective Kirtlan, Jesse's trial counsel asked: "Now, when [Neal] came to talk to you, isn't it true that the first thing you said to him is, I know you're the victim?" The detective answered: "Something to that effect, yes." Counsel then asked: "Wouldn't it have been better to wait until you had heard what he had to say before you accepted his innocence?" The detective responded: "As I discussed earlier, there was overwhelming evidence in this case, as I've outlined, as to why I felt he was the victim and fired back in self-defense, as shared with the D.A.'s office, who agreed, and in this case gave him a letter of immunity."

During the prosecution's redirect examination, the prosecutor asked Detective Kirtlan: "Is there anything other than what you've already stated, which is the placement of the casings and the evidence around the scene, the statements from [Boyd] and other witnesses and the overall ballistics evidence in the case, including the shot into [a neighboring] house, that causes you to take the position that, in fact, [Neal] was being truth[ful] -- that [Neal] did fire back second?" The detective answered: "Yes, there is." Then, after various objections were overruled, he explained: "[Ellison] was pulling into his driveway. He was in his neighborhood. He is not going to attract, nor would the occupants of his vehicle, in my belief, attract trouble to their home. [¶] The [Explorer]

15

was out of the area. They're south area occupants up in the north area in a vehicle with weapons. [Ellison] was pulling into his driveway. [¶] If they were -- if [Neal] were to have shot, the vehicle gets away, now they know where to come back to retaliate. [¶] It doesn't make sense to me. And given the totality of the rest of the evidence, that led me to my determination that the Taurus was fired on." Isaac's trial counsel then objected that the answer was an "[i]mproper opinion," which was overruled.

During Detective Sample's expert testimony, the prosecutor asked: "Assume that you have a gang member with several other people in his car. This gang member is feeling vulnerable. He has got a gun in his car. He's been threatened, he's been labeled a snitch. And he comes down the street and he sees other people coming towards him who are muggin' him, they don't -- he doesn't know them, the people in his car don't know them, but they know that they are giving hard looks to him. [¶] Would it be consistent with your knowledge of gang members for those people feeling vulnerable to turn into a dead end and leave themselves open to attack?" Jesse's trial counsel objected that the answer was "speculative," which was overruled. The detective then answered: "No, it did not -- it would not seem a likely response for somebody who's that alert to a possible threat."

**B.**

*Analysis*

Defendants argue the testimony of both detectives amounted to improper expert opinion for three reasons: (1) "the subject matter was not beyond the common experience of the average juror"; (2) "the opinion was essentially a question of whether the experts thought that Neal and [Boyd] were telling the truth when they testified that the [defendants] fired first"; and (3) because "the whole case boiled down to whether the jury determined that Neal fired first or they fired first," the testimony amounted to "their view of how the case should be decided." In response, the Attorney General draws a

16

distinction between the two witnesses. With respect to Detective Kirtlan, the Attorney General argues the challenged testimony "was not admitted as his opinion on whether Neal in fact acted in self defense," but rather "was properly admitted to rebut the implied bias raised by the defense under Evidence Code section 780, subdivision (f)," i.e., the detective concluded Neal fired in self-defense before speaking to him because of a prior working relationship with Ellison and Boyd because Ellison had cooperated in a previous case against a fellow gang member. With respect to Detective Sample, the Attorney General argues the challenged testimony was a proper expert opinion.

### 1. *Detective Kirtlan's Testimony was Properly Admitted*

"In determining the credibility of a witness, the jury may consider, among other things, '[t]he existence or nonexistence of a bias, interest, or other motive' for giving the testimony. (Evid. Code, § 780, subd. (f).)" (*People v. Price* (1991) 1 Cal.4th 324, 422.) "Evidence showing a witness's bias or prejudice or which goes to his [or her] credibility, veracity or motive may be elicited during cross-examination." (*People v. Howard* (1988) 44 Cal.3d 375, 428.) Here, Jesse's trial counsel properly sought to elicit such evidence during his cross-examination of Detective Kirtlan by asking whether he was "frequently in contact" with Ellison and Boyd during his investigation of the previous case in which Ellison provided testimony against another gang member, which the detective admitted, and whether this working relationship made Detective Kirtlan "a little more emphatic" about "find[ing] the people that [he] believed were responsible," which the detective denied. Counsel then asked Detective Kirtlan about his interview with Neal, specifically, whether he accepted the fact Neal was an innocent victim before he even "heard what he had to say." The purpose for these questions, and the order in which they were asked, is unmistakable. Counsel was seeking to establish that the detective did not consider the possibility Neal could have started the gun fight by firing on the Explorer because of his bias in favor of Ellison, one of his "snitches."

17

In these circumstances, it was proper for the prosecution to then rehabilitate the detective by eliciting the reason he believed Neal did not fire first before he had spoken to the man.  In other words, the challenged testimony was offered to show the detective's belief Neal fired in self-defense was based on reason, as opposed to mere bias, as the defense questioning suggested.  (See, e.g., *People v. Nichols* (1970) 3 Cal.3d 150, 157 [prosecution properly offered evidence of the reasonable basis for witness's testimony to rebut inference of bias raised by the defense on cross-examination].)

### 2. ***Detective Sample's Testimony was Properly Admitted***

Expert opinion testimony must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact."  (Evid. Code, § 801, subd. (a).)  "The subject matter of the culture and habits of criminal street gangs . . . meets this criterion."  (*People v. Gardeley* (1996) 14 Cal.4th 605, 617, disapproved on another point in *People v. Sanchez, supra,* 63 Cal.4th 665.)  Here, Detective Sample testified, based on his special knowledge, training, education, and experience working as a gang detective, that a gang member who is feeling vulnerable because he has been threatened and labeled a snitch would not be likely to turn into a dead end and leave himself open to attack.  Defendants argue this specific opinion was not sufficiently beyond common experience to be helpful to the jury because "[n]o sensible person, regardless of their gang status, would knowingly place themselves in a trap if they thought the[y] were under threat."  We disagree.  While no sensible person would pull into his own driveway and start a gun fight with no means of escape, whether a *gang member* would do so is not something the average juror would know.  Nor was Detective Sample's testimony simply an opinion as to whether Neal and Boyd had testified truthfully concerning how the gun fight occurred, or as to how the jury should ultimately decide the case.

18

The trial court did not abuse its discretion in allowing the challenged testimony of Detectives Kirtlan and Sample.

## III

### *Exclusion of Defense Evidence*

Defendants claim the trial court prejudicially erred and violated their constitutional right to due process by excluding evidence of a post made to Ellison's Facebook page on the day of the shooting, which they argue indicated Ellison "had reentered gang life" and "was associating with gang members." According to defendants, this evidence was highly probative of their defense, i.e., Ellison was killed in self-defense after Neal opened fire on them, because "the people in Ellison's car had the same motivations to shoot first as the gang expert attributed to [defendants]." Defendants also claim the excluded evidence "would [have] support[ed] the defense contention that Ellison drove his car in a way to force [defendants] to stop in front of his house" and "would [have] rebut[ted] [Boyd's] testimony that Ellison only purchased the gun because he was afraid of being attacked because he was cooperating with the police."

### A.

### *Additional Background*

Jesse moved in limine to introduce a printout from Ellison's Facebook page that included a post made around two hours before the murder. The post stated: "GET MONEY TRUST NOT A SOUL MONEY AND MURDER I SWEAR IM BACK AT IT AGAIN WHO CAN I TRUST IN THIS WORLD????????????????????? GET ACTIVE." The printout also included Ellison's profile picture, in which he was apparently making a gang sign with his hands.

Jesse's trial counsel argued the post was relevant to show Ellison's state of mind at the time of the shooting, i.e., he and the other occupants of the Taurus "were expecting to get hit" and "were expecting trouble," which he argued was "very probative of who

19

fired first."  Counsel also argued the post was admissible despite the hearsay rule because it qualified as a statement of Ellison's then-existing state of mind and a statement against penal interest.  Counsel further argued Boyd, who also had access to Ellison's Facebook account, could authenticate the post.  Isaac's attorney joined in these arguments.

In response, the prosecutor did not object to the profile picture being admitted, but argued defense counsel was attempting to "circumvent the hearsay rules and circumvent the foundational requirements" by seeking to admit the Facebook post.  With respect to hearsay, the prosecutor did not actually make an argument.  With respect to foundation, the prosecutor questioned whether counsel would be able to establish Ellison "did in fact, make that entry."

After further argument from defense counsel, the trial court took the matter under submission.

Trial began without a ruling on admissibility of the Facebook post.  The following exchange occurred during Jesse's cross-examination of Neal:

"Q     Did you also say that [Ellison] don't even gang bang no more?

"A     Yes, I did say that.  He did not gang bang anymore.

"Q     You don't know -- you say you know that for a fact?

"A     I know that for a fact.  [¶]  He got married and he was a family -- was a family man.  He was changing his life.  His grandma had just passed away.  He had just got saved.  [¶]  He was -- he was a totally different dude that I know from growin' up with.  I know for a fact he did not gang bang anymore.

"Q     Did you ever go on his Facebook page?

"A     Yes, I did.

"Q     When was the last time you went on his Facebook page?

20

"A      Um, I been on there after he was killed.  I been on there before he was killed."

At this point, counsel again sought to admit the Facebook post, arguing the post was admissible under Evidence Code section 780 as evidence tending to disprove the truthfulness of Neal's testimony that Ellison was no longer "gang banging."  The trial court ruled the post inadmissible under Evidence Code section 352, as requiring the jury to "embark on . . . something that's a bit of a side show, and that is the question of whether or not [Neal] believes [Ellison] was involved as a gang banger at the time."  The trial court then instructed the jury to disregard Neal's "opinions as to whether or not [Ellison] was or was not involved actively as a member of a gang."

## B.

### *Forfeiture*

We first note neither Jesse's trial counsel, nor counsel of either co-defendant, pressed for a ruling on the matter of whether or not the Facebook post was admissible as substantive evidence Neal fired first, prompting Adam and Isaac to return fire in self-defense.  (See *People v. Braxton* (2004) 34 Cal.4th 798, 813-814 [failure to press for a ruling generally forfeits contention of error].)  Indeed, Adam's trial counsel did not join in the argument in the first place.  (See *People v. Wilson, supra,* 44 Cal.4th at p. 793 [failure to join in the objection or motion of a codefendant generally forfeits the issue on appeal].)  When the matter of the Facebook post was revisited during Jesse's cross-examination of Neal, counsel sought to admit the evidence *to impeach Neal's testimony that Ellison was no longer a gang member*, but did not indicate to the trial court he was also pressing for a ruling on whether the evidence was admissible to prove self-defense.  Thus, the trial court ruled the Facebook post was not admissible *to impeach Neal* under an Evidence Code section 352 analysis.  The trial court never ruled on the initial motion to admit this evidence *to prove self-defense*, nor did any of the defendants press the trial

21

court to do so.  By failing to press for a ruling—and in Adam's case, by failing to join in the argument altogether—defendants have forfeited their now-joint contention the trial court prejudicially erred and violated their due process rights by excluding the proffered evidence.

## C.

### *Ineffective Assistance of Counsel*

Anticipating forfeiture, Jesse argues his trial counsel rendered constitutionally deficient assistance by failing to "explicitly argue that the fact that Ellison had returned to an active gang life would tend to show that he and his associates . . . were just as likely to fire first as were Jesse and his associates."  Adam and Isaac join in this argument as well, which we interpret as arguing their respective counsel were equally ineffective.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution.  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  This right "entitles the defendant not to some bare assistance but rather to *effective* assistance.  [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.'  [Citations.]"  (*Ibid.,* quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.)  "'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective standard of reasonableness . . . under prevailing professional norms."  [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof.  [Citation.]  Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."'"  (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v.*

22

*Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.)

Defendants have not carried their burden. Even assuming (1) counsel would have been able to establish Ellison in fact made the post to his Facebook page, (2) the post indeed meant Ellison had decided to return to an active gang lifestyle, (3) defendants are correct that the Facebook post was relevant to establish (a) Neal was just as likely to have fired first as were Adam and Isaac, (b) Ellison likely drove the Taurus in between the first car and the Explorer in order to force defendants to stop in front of his house, and (c) contrary to Boyd's testimony, Ellison did not purchase the handgun solely because he was afraid of being attacked for having cooperated with the police, and (4) the post was not inadmissible hearsay because it evidenced Ellison's then-existing state of mind, we cannot conclude exclusion of this evidence would have been an abuse of discretion under Evidence Code section 352 or a violation of their constitutional right to due process.

Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." Our Supreme Court has explained this section "permits the trial judge to strike a careful balance between the probative value of the evidence and the danger of prejudice, confusion and undue time consumption," but "requires that the danger of these evils substantially outweigh the probative value of the evidence." (*People v. Lavergne* (1971) 4 Cal.3d 735, 744; see also *People v. Holford* (2012) 203 Cal.App.4th 155, 168.) Rulings under this provision "come within the trial court's discretion and will not be overturned absent an abuse of that discretion." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1070.)

23

Here, the Facebook post was minimally probative of defendants' claim of self-defense. Even assuming the post established in the jurors' minds that Ellison possessed the gun, not simply for protection, but also for gang purposes, i.e., confrontation, and Ellison deliberately cut off the Explorer while pulling into his driveway, neither fact would justify defendants' actions of opening fire on Ellison's car. The only purported fact that would justify such an assault is Neal's firing at the Explorer first, or at the very least, pointing Ellison's gun in defendants' direction, and thereby causing a reasonable belief in the need to employ deadly force in self-defense. But the Facebook post was made by *Ellison*, not *Neal*. There is no dispute Neal was the one who fired Ellison's gun. Indeed, Ellison was apparently hit before he could put the car in park. Ellison's post was therefore relevant on the issue of Neal's conduct only if Neal was aware of the post. In other words, Ellison's decision to return to gang life, by itself, does not tend to prove anything *about Neal*. However, Neal's belief Ellison was out of the gang life would tend to make it less likely that he would take it upon himself to use Ellison's gun to fire upon another vehicle in front of Ellison's house had occupants of that vehicle not fired first. Conversely, Neal's belief Ellison had returned to the gang life would tend to make his firing first in these circumstances more likely. But how much more likely? We conclude the answer is "not much." The evidence established Ellison had offered testimony against a rival gang member, had been threatened for having done so, and was pulling into his driveway when the shooting occurred. In these circumstances, regardless of whether Ellison had decided to return to the gang lifestyle, and regardless of whether Neal was aware of this decision, opening fire on an Explorer full of gang members *in front of Ellison's house, and in a driveway with no means of escape* when the occupants of the Explorer predictably returned fire, is so unlikely as to be implausible.

Weighing against this low level of probative value is the reality that admission of the evidence would have required a significant consumption of time. The defense would

24

have been required to establish what we have assumed in our analysis thus far, i.e., the post was in fact made by Ellison, the post indeed meant Ellison had returned to an active gang lifestyle, and Neal was aware of his return to this lifestyle. In light of the minimal probative value of the evidence, we cannot conclude the trial court would have abused its discretion by excluding the evidence under an Evidence Code section 352 analysis. Nor are we persuaded such a decision would have amounted to a deprivation of due process. While defendants are correct to point out Evidence Code section 352 "must bow to the due process right of a defendant to a fair trial and his [or her] right to present all relevant evidence of significant probative value to his [or her] defense[,] . . . the proffered evidence must have more than slight relevancy to the issues presented. [Citation.]" (*People v. Burrell–Hart* (1987) 192 Cal.App.3d 593, 599; *People v. Reeder* (1978) 82 Cal.App.3d 543, 553.) Here, as we have already explained, the Facebook post did not have significant probative value.

In sum, because admission of the Facebook post would have necessitated an undue consumption of time and the post was not significantly probative of defendants' claim of self-defense, the trial court would not have abused its discretion or violated defendants' due process rights by excluding the evidence under Evidence Code section 352 had defendants' respective counsel pressed for a ruling on the matter. Thus, regardless of whether reasonable counsel would have pressed for such a ruling, our confidence in the outcome is not undermined.

## IV

### *Causation Instruction*

Defendants also contend the trial court prejudicially erred and violated their constitutional rights by providing the jury with a different instruction on causation than that contained in bracketed portions of CALCRIM No. 520. We disagree.

25

CALCRIM No. 520 defines the crime of murder for the jury. The jury was so instructed.[6] Defendants complain the trial court did not provide the following bracketed portions of the instruction on the issue of causation: "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A *substantial factor* is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (CALCRIM No. 520.)

Instead of the foregoing bracketed portions of CALCRIM No. 520, the trial court instructed the jury, in language virtually identical to CALJIC No. 3.41, as follows: "There may be more than one proximate cause of a homicide, even when there is only one known or actual or direct cause of death. [¶] When the conduct of two or more

---

[6]   As given to the jury in this case, CALCRIM No. 520 provides: "The defendants are charged in Count One with murder. To prove that the defendant is guilty of this crime, the People must prove that, one, the defendant committed an act that caused the death of another person. [¶] Two, when the defendant acted, he had a state of mind called malice aforethought. And, three, he killed without lawful justification. [¶] There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. A defendant acted with implied malice if, one, he intentionally committed an act. [¶] Two, the natural and probable consequences of that act are dangerous to human life. Three, at the time he acted, he knew his act was dangerous to human life, and, four, he deliberately acted with conscious disregard for human life. [¶] Malice aforethought does not require hatred or ill-will toward the victim. It is a mental state that must be formed before the act that causes death is committed. [¶] It does not require deliberation or the passage of any particular period of time."

26

persons contributes concurrently as a proximate cause of the death, the conduct of each is a proximate cause of the death if that conduct was also the substantial factor contributing to the result. [¶] A cause is concurrent if it was operative at the time of death and acted with another cause to produce death."

Both CALCRIM No. 520 and CALJIC No. 3.41 indicate in their respective use notes that a trial court has a sua sponte duty to instruct on proximate cause if causation is an issue in the case. (Use Notes to CALCRIM No. 520 and CALJIC No. 3.41.) CALCRIM No. 520's use note continues: "If the evidence indicates that there was only one cause of death, the court should give the 'direct, natural, and probable' language in the first bracketed paragraph on causation. If there is evidence of multiple causes of death, the court should also give the 'substantial factor' instruction and definition in the second bracketed causation paragraph." (Use Note to CALCRIM No. 520.)

"The California Judicial Council withdrew its endorsement of the long-used CALJIC instructions and adopted the new CALCRIM instructions, effective January 1, 2006." (*People v. Thomas* (2007) 150 Cal.App.4th 461, 465.) California Rules of Court,[7] rule 2.1050(e) provides: "Use of the Judicial Council instructions is strongly encouraged. If the latest edition of the jury instructions approved by the Judicial Council contains an instruction applicable to a case and the trial judge determines that the jury should be instructed on the subject, it is recommended that the judge use the Judicial Council instruction unless he or she finds that a different instruction would more accurately state the law and be understood by jurors." However, as our Supreme Court has explained, "a trial court's failure to give the *standard* . . . instruction does not necessarily constitute state law error," and while "use of the standard instruction . . . is preferred, it is not mandatory." (*People v. Aranda* (2012) 55 Cal.4th 342, 354.) Nor does

---

[7]     Undesignated rule references are to the California Rules of Court.

27

the trial court's failure to use the standard instruction "amount to state law error when its substance is covered in other instructions given by the court." (*Ibid*.)

Here, the substance of the second bracketed causation paragraph of CALCRIM No. 520 was covered by the CALJIC instruction given to the jury. "CALJIC instructions that were legally correct and adequate on December 31, 2005, did not become invalid statements of the law on January 1, 2006. Nor did their wording become inadequate to inform the jury of the relevant legal principles or too confusing to be understood by jurors. The Judicial Council's adoption of the CALCRIM instructions simply meant they are now endorsed and viewed as superior. No statute, Rule of Court, or case mandates the use of CALCRIM instructions to the exclusion of other valid instructions." (*People v. Thomas*, *supra*, 150 Cal.App.4th at pp. 465-466.)

However, we do agree with defendants on two points. First, the instruction given to the jury in this case, CALJIC No. 3.41, omits "the basic legal definition of cause." This is because that definition was provided in CALJIC No. 3.40, which was not given to the jury.[8] Second, the instruction given to the jury used the term "proximate cause," which does not appear in either the current CALCRIM instruction or the post-1992 CALJIC version of the instruction. This is because our Supreme Court has held use of the term "proximate cause" in such an instruction "may mislead jurors, causing them . . . to focus improperly on the cause that is spatially or temporally closest to the harm." (*Mitchell v. Gonzales* (1991) 54 Cal.3d 1041, 1052; *People v. Roberts* (1992) 2 Cal.4th

_____

[8]     This instruction states in relevant part: "The criminal law has its own particular way of defining cause. A cause of the (result of the crime) is an [act] [or] [omission] that sets in motion a chain of events that produces as a direct, natural and probable consequence of the [act] [or] [omission] the (result of the crime) and without which the (result of the crime) would not occur." (CALJIC No. 3.40.)

28

271, 313.) However, as we explain immediately below, the error was harmless under any standard.

In this case, as in *People v. Sanchez* (2001) 26 Cal.4th 834, "it is proximate causation, not direct or actual causation, which, together with the requisite culpable mens rea (malice), determines [defendants'] liability for murder." (*Id.* at p. 845.) Here, there was no dispute Ellison died of a single gunshot wound. This was the direct, but-for cause of death. Overwhelming evidence established both Adam and Isaac fired into Ellison's car. Who fired the fatal shot is irrelevant. As our Supreme Court explained: "A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet. For example, in *People v. Sanchez*, *supra*, 26 Cal.4th 834, . . . two persons engaged in a gun battle, killing an innocent bystander. Who fired the fatal bullet, and thus who personally inflicted the harm, was unknown, but we held that the jury could find that *both* gunmen proximately caused the death. (*Id.* at pp. 848–849 . . . .)" (*People v. Bland* (2002) 28 Cal.4th 313, 337.) The same is true here. While the jury should have been instructed with the "direct, natural, and probable consequences" language, we have no doubt the jury reached the same conclusion without it, i.e., the act of firing the fatal shot caused Ellison's death. Then, under the instruction that was provided, the jury properly concluded both Adam and Isaac proximately caused the death regardless of who fired the fatal shot. Moreover, use of the term "proximate cause" in the instruction, while improper, could only have benefitted defendants by potentially misleading jurors that proximate cause has a "'physical or temporal nearness'" requirement that does not exist in the law. (*People v. Bland*, *supra*, 28 Cal.4th at p. 338.) As for Jesse, liability for murder turned on principles of aiding and abetting, on which the jury was appropriately instructed. Thus, any instructional error was manifestly harmless.

Nevertheless, defendants argue there is evidence the occupants of the smaller car in front of the Explorer may have also fired upon Ellison's car, and one of them might have fired the fatal shot. While there is some evidence shots may have also been fired from the smaller car, this would not undermine our conclusion Adam and Isaac, by firing their own bullets into Ellison's car, also proximately caused Ellison's death. Stated simply, assuming there were three gunmen instead of two, who fired the fatal bullet is still unknown, and the jury could find *all three* gunmen proximately caused the death. Nor are we persuaded by the argument, made in Adam's opening brief, it would be speculative to conclude that "defendants were acting in concert with the occupants of the other vehicle, or that the occupants of the two vehicles even knew each other." If, as defendants suggest, both the Explorer and the smaller lead car fired upon Ellison's car as it pulled into the driveway, a reasonable inference is that the two vehicles were acting in concert. Adam's trial counsel acknowledged as much when he argued in closing that the smaller car was "a companion car" containing "friends of theirs." Moreover, defendants cite no authority for the proposition that the two cars had to act in concert in order for Adam and Isaac to have proximately caused Ellison's death by also firing upon his car. Indeed, in *People v. Sanchez*, *supra*, 26 Cal.4th 834, the two gunmen who were found to have proximately caused the death of the innocent bystander were not acting in concert, but rather in opposition to each other. (*Id*. at pp. 840-841.)

We conclude that while the trial court erred by instructing the jury with an out-of-date version of CALJIC No. 3.41, rather than the preferred bracketed portions of CALCRIM No. 520 on causation, the error was manifestly harmless under any standard of prejudice.

# V

## *Modification of the Abstract of Judgment*

The final claim asserted by all defendants is that their respective abstracts of judgment must be modified to reflect the victim restitution order is a joint and several obligation. The Attorney General concedes the point. We accept the concession and order the modification. (See *People v. Leon* (2004) 124 Cal.App.4th 620, 622 [trial court may impose liability on each defendant to pay the full amount of the economic loss as long as the victim does not obtain a double recovery]; *People v. Blackburn* (1999) 72 Cal.App.4th 1520, 1535 [to avoid double recovery, the court has authority to order victim restitution paid jointly and severally].)

## ADAM AND ISAAC

# VI

## *Cruel and Unusual Punishment*

Adam and Isaac also assert the trial court's imposition of a sentence the functional equivalent of LWOP amounts to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. In light of our Supreme Court's recent decision in *Franklin*, *supra*, 63 Cal.4th 261, we conclude the claim is moot. Moreover, based on the procedural context of this case, we need not order the limited remand that was ordered in *Franklin*.

## A.

### *Additional Background*

Adam and Isaac were 17 and 16 years old, respectively, when they opened fire on Ellison and his companions, killing Ellison. Isaac was also developmentally disabled. Isaac's sentencing memorandum argued the probation department's recommendation that the trial court impose an indeterminate term of 170 years to life, plus a consecutive determinate term of 37 years 4 months, "on a mentally impaired minor with a severely

31

disadvantaged upbringing, including a drug-addicted mother, absent father figure, periods of homelessness, and an abusive and chaotic family life" would violate the Eighth Amendment. Adam's sentencing memorandum similarly argued the probation department's recommendation that the trial court impose such a sentence "on a boy of only 17 years of age at the time of the offense, constitutes cruel and unusual punishment in violation of the Eighth Amendment."

The trial court sentenced Adam and Isaac to serve an aggregate indeterminate prison term of 120 years to life plus a consecutive determinate term of 9 years 4 months. This sentence was comprised of the following: 20 years to life for second-degree murder by means of shooting a firearm from a motor vehicle with intent to inflict great bodily injury (§§ 187, 190, subd. (d)), plus 25 years to life for the greatest firearm enhancement attached to that crime (i.e., personally and intentionally discharging a firearm causing great bodily injury or death (§ 12022.53, subd. (d)), plus a consecutive determinate term of 9 years 4 months (4 consecutive terms of 2 years 4 months (one-third the middle term of 7 years)) for the attempted murders (§§ 187, 664, subd. (a)), plus *3* additional terms of 25 years to life for the same firearm enhancement attached to *3* of the attempted murders. The trial court ran *one* of these 25-years-to-life firearm enhancements concurrently "in light of the constitutional scheme argued by defense."

**B.**

*Analysis*

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual punishments" and "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" (*Ewing v. California* (2003) 538 U.S. 11, 20 [123 S.Ct. 1179, 155 L.Ed.2d 108] quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997 [111 S.Ct. 2680, 115 L.Ed.2d 836].) This constitutional right "'flows from the basic "precept of justice that punishment for crime should be graduated and proportioned"'" to both the

offender and the offense." (*Miller v. Alabama* (2012) 567 U.S. ___, ___ [132 S.Ct. 2455, 2458, 183 L.Ed.2d 407] (*Miller*), quoting *Roper v. Simmons* (2005) 543 U.S. 551, 560 [125 S.Ct. 1183, 161 L.Ed.2d 1].)

In *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), the United States Supreme Court held the Eighth Amendment "prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender." (*Id*. at p. 75.) The court explained: "As compared to adults, juveniles have a '"lack of maturity and an underdeveloped sense of responsibility"'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.' [Citation.] These salient characteristics mean that '[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.' [Citation.] A juvenile is not absolved of responsibility for his [or her] actions, but his [or her] transgression 'is not as morally reprehensible as that of an adult.' [Citation.]" (*Id*. at p. 68.) The court also explained that "defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment than are murderers," and therefore, "when compared to an adult murderer, a juvenile offender who did not kill or intend to kill has a twice diminished moral culpability. The age of the offender and the nature of the crime each bear on the analysis." (*Id*. at p. 69.)

Turning to the severity of an LWOP sentence, the court explained such a sentence "deprives the convict of the most basic liberties without giving hope of restoration, except perhaps by executive clemency—the remote possibility of which does not mitigate the harshness of the sentence," and noted this is "an especially harsh punishment for a

33

juvenile," who "will on average serve more years and a greater percentage of his [or her] life in prison than an adult offender." (*Graham*, *supra*, 560 U.S. at pp. 69-70.) Finally, the court explored the penological justifications for such a sentence and concluded them to be "not adequate to justify life without parole for juvenile nonhomicide offenders." (*Id*. at p. 74.) However, the court was also careful to point out the Eighth Amendment "does not require the State to release that offender during his [or her] natural life," explaining: "Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does forbid States from making the judgment at the outset that those offenders never will be fit to reenter society." (*Id*. at p. 75.)

In *Miller*, *supra*, 567 U.S. ___ [132 S.Ct. 2455, 183 L.Ed.2d 407], the United States Supreme Court held the Eighth Amendment forbids a state from *mandating* the imposition of an LWOP sentence on a juvenile homicide offender. (*Id*. at p. 2469.) The court explained: "Mandatory life without parole for a juvenile precludes consideration of his [or her] chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him [or her]—and from which he [or she] cannot usually extricate himself [or herself]—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his [or her] participation in the conduct and the way familial and peer pressures may have affected him [or her]. Indeed, it ignores that he [or she] might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his [or her] inability to deal with police officers or prosecutors (including on a plea agreement) or his [or her] incapacity to assist his [or her] own attorneys. [Citations.]

34

And finally, this mandatory punishment disregards the possibility of rehabilitation even when the circumstances most suggest it." (*Id.* at p. 2468.) The court concluded: "Although we do not foreclose a sentencer's ability to [impose an LWOP sentence on a juvenile] in homicide cases, we require it to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Id.* at p. 2469.)

In *People v. Caballero* (2012) 55 Cal.4th 262 (*Caballero*), our Supreme Court held "sentencing a juvenile offender for a nonhomicide offense to a term of years with a parole eligibility date that falls outside the juvenile offender's natural life expectancy," i.e., the "functional equivalent" of an LWOP sentence, "constitutes cruel and unusual punishment in violation of the Eighth Amendment. Although proper authorities may later determine that youths should remain incarcerated for their natural lives, the state may not deprive them at sentencing of a meaningful opportunity to demonstrate their rehabilitation and fitness to reenter society in the future. . . . [T]he sentencing court must consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to his or her chronological age at the time of the crime, whether the juvenile offender was a direct perpetrator or an aider and abettor, and his or her physical and mental development, so that it can impose a time when the juvenile offender will be able to seek parole from the parole board. The Board of Parole Hearings will then determine whether the juvenile offender must be released from prison 'based on demonstrated maturity and rehabilitation.'" (*Id.* at pp. 268-269, quoting *Graham*, *supra*, 560 U.S. at p. 75.)

In *Franklin*, *supra*, 63 Cal.4th 261, our Supreme Court held, "just as *Graham* applies to sentences that are the 'functional equivalent of a life without parole sentence' [citation], so too does *Miller* apply to such functionally equivalent sentences," (*Franklin,* at p. 276) such that "a juvenile may not be sentenced to the functional equivalent of

35

LWOP for a homicide offense without the protections outlined in *Miller*." (*Franklin* at p. 276.) However, the court also held the Legislature's passage of SB 260 (2013-2014 Reg. Sess.), which became effective January 1, 2014, and provides juvenile offenders with an opportunity for parole at least by their 25th year of incarceration, renders moot an assertion that "an otherwise lengthy mandatory sentence" was imposed in violation of *Miller, supra,* 132 S.Ct. 2455, at least where the defendant is not excluded from eligibility for such a parole hearing. (*Franklin* at pp. 278-282.)

In so holding, the court explained "the Legislature passed [SB 260] explicitly to bring juvenile sentencing into conformity with *Graham*, *Miller*, and *Caballero*." (*Franklin*, *supra*, 63 Cal.4th at p. 277.) It did so by adding section 3051 to the Penal Code, "which requires the Board [of Parole Hearings] to conduct a 'youth offender parole hearing' during the 15th, 20th, or 25th year of a juvenile offender's incarceration," depending on the length of the offender's "'[c]ontrolling offense.'" (*Franklin* at p. 277, quoting § 3051, subds. (a)(2)(B), (b).) Thus, section 3051 "provides all juvenile offenders with a parole hearing during or before their 25th year of incarceration," unless they come within one of the statute's exclusions, set forth in subdivision (h). (*Franklin,* at p. 278.) While a juvenile offender's original sentence remains operative, "section 3051 has changed the manner in which [that] sentence operates by capping the number of years that he or she may be imprisoned before becoming eligible for release on parole," thereby "supersed[ing] the statutorily mandated sentences" of non-excluded juvenile offenders. (*Id*. at p. 278.) "The Legislature has effected this change by operation of law, with no additional resentencing procedure required." (*Id*. at p. 278.) Because the parole eligibility cap of section 3051 supersedes the mandatory sentence imposed by the trial court, "[s]uch a sentence is neither LWOP nor its functional equivalent," and therefore, "no *Miller* claim arises." (*Franklin,* at p. 279.)

36

Here, as in *Franklin*, *supra*, 63 Cal.4th 261, Adam and Isaac do not come within any of section 3051's exclusions and their controlling offenses carried a prison term of 25 years to life, making them eligible for a youth offender parole hearing during their respective 25th years of incarceration. However, unlike *Franklin*, where the trial court imposed a mandatory sentence of 50 years to life, the trial court in this case was not required to impose an aggregate indeterminate prison term of 120 years to life plus a consecutive determinate term of 9 years 4 months. In *Franklin*, our Supreme Court limited its "mootness holding" to circumstances in which "section 3051 entitles an inmate to a youth offender parole hearing against the backdrop of an otherwise lengthy *mandatory* sentence" and expressed no view "on *Miller* claims by juvenile offenders . . . who are serving lengthy sentences imposed under *discretionary* rather than mandatory sentencing statutes." (*Id*. at p. 280, italics added.) Nevertheless, a sizeable portion of the sentences imposed in this case was mandatory. The trial court had no discretion but to impose a term of 20 years to life for the murder and a consecutive term of 25 years to life for the firearm enhancement attached to that count. (See §§ 190, subd. (d), 12022.53, subd. (d).) While the trial court did possess discretion to impose concurrent rather than consecutive sentences on the remaining attempted murder counts (see § 669; *People v. Shaw* (2004) 122 Cal.App.4th 453, 458 [trial court has "broad discretion to impose consecutive sentences when a person is convicted of two or more crimes"]), the lowest possible term these juvenile offenders were eligible for was 45 years to life. Moreover, as we have explained, the rationale behind the court's mootness holding in *Franklin* is that section 3051 "effectively reforms the parole eligibility date of a juvenile offender's original sentence so that the longest possible term of incarceration before parole eligibility is 25 years." (*Franklin*, *supra*, 63 Cal.4th at p. 281.) If that fact precludes a lengthy mandatory sentence from being considered the functional equivalent of LWOP,

37

we perceive no reason the same would not be true with respect to the sentences imposed here, a portion of which was mandatory and the remainder discretionary.

Simply put, SB 260 has rendered moot the *Miller, supra,* 132 S.Ct. 2455 claim brought by Adam and Isaac by superseding their original sentences, effectively reforming the parole eligibility date so that they will be eligible for parole during their respective 25th years of incarceration.

Ordinarily, the conclusion that a claim is moot ends the inquiry. However, in *Franklin*, the court remanded the matter to the trial court for the limited purpose of determining whether or not the juvenile offender in that case "was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.) This was done because the youth offender parole hearing established by SB 260 "shall provide for a meaningful opportunity to obtain release" (§ 3051, subd. (e)), which requires the Board of Parole Hearings to "give great weight to the diminished culpability of juveniles as compared to adults, the hallmark features of youth, and any subsequent growth and increased maturity" (§ 4801, subd. (c)), the statutory scheme also "contemplate[s] that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration" (*Franklin,* at pp. 283-284, citing § 3051, subd. (f)), and it was "not clear" whether the juvenile offender in *Franklin* "had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin,* at p. 284.) Indeed, because the juvenile offender in *Franklin* was sentenced before *Miller, supra,* 132 S.Ct. 2455 was decided, and because the term imposed was a mandatory sentence, the trial court understandably deemed such mitigating evidence irrelevant. (*Franklin,* at p. 283.)

In contrast, here, Adam and Isaac were sentenced after the *Miller* decision (*Miller, supra,* 132 S.Ct. 2455) and the record establishes they were afforded sufficient opportunity to make a record regarding their characteristics and circumstances at the time they opened fire on Ellison's car. Specifically, in their respective sentencing memoranda, Adam and Isaac each argued the sentence recommended by the probation department violated the Eighth Amendment and urged the trial court to impose a term of 20 years to life based on *Miller*, *Graham, supra,* 560 U.S. 48, and *Caballero, supra,* 55 Cal.4th 262. Adam's submission included 23 character reference letters attesting to his good character despite his active participation in the murder. The content of these letters relates directly to the question of whether Adam is one of those rare juvenile offenders who may be deemed to be "irreparably corrupt, beyond redemption, and thus unfit ever to reenter society . . . ." (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

Isaac's memorandum argued that, in addition to his youth, "severe mental disabilities" mitigated his culpability, explaining: "The neuropsychological evaluation concludes that he has 'cognitive disorder/dementia generalized, severe.' Dr. Wicks testified at trial that [Isaac] was brain damaged. Not only is his IQ very low placing him within the mentally retarded range, he suffers from impairment to his executive functioning, causing him to engage in poor decision making. Also interfering with his ability to make decisions is his tendency to impulsive action, which was testified to by Dr. Wicks. While [Isaac's] chronological age at the time of the offense was 16, *his mental age is 9*." Aside from his mental impairment, which Isaac argued may have been caused in part by the fact he was "born with methamphetamine in his system" and his mother did not receive adequate prenatal care during her pregnancy, Isaac also argued his mother's drug addiction and father's absence resulted in him "receiv[ing] virtually no support or guidance as a child." Isaac also pointed to evidence he "was sexually abused by his brother," "his father abused other family members," and his "family became

39

homeless when he was 12 or 13 [years old] and he had to rely on his friends for food and shelter." Analogizing Isaac's background to that of the defendant in *Miller, supra*, 132 S.Ct. 2455, wherein the high court noted, "if ever a pathological background might have contributed to a 14-year-old's commission of a crime, it is here" (*id.* at p. 2469), the sentencing memorandum concluded: "[Isaac's] background affected his participation in this crime. Given [his] impairments and total lack of support, it is not realistic to think that he could have extricated himself from his family environment. All of the foregoing factors act to reduce [Isaac's] moral culpability." Before the trial court sentenced Adam and Isaac, the court stated it had considered all of the arguments and materials submitted on behalf of defendants.

As contemplated by the statutory scheme enacted by SB 260, the foregoing information regarding Adam and Isaac's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration as to whether or not to grant them release. (*Franklin*, *supra*, at pp. 283-284; § 3051, subd. (f).) We therefore need not remand the matter to the trial court for a determination as to whether these juvenile offenders had an opportunity to produce such evidence.

## ISAAC'S REMAINING CONTENTIONS

## VII

### *Rule of Completeness*

Isaac contends the trial court prejudicially erred and violated his constitutional rights by allowing one of the detectives in the case to convey a misleading portion of his police statement rather than require the prosecution to play the entire statement for the jury. We disagree.

40

## A.

### *Additional Background*

Ellison was killed by a 9-millimeter bullet. Police found multiple 9-millimeter and 10-millimeter shell casings in the street in front of Ellison's house. As mentioned, they found the corresponding 10-millimeter handgun along the chase route. However, while police also found a magazine for a 9-millimeter handgun along the chase route, they did not find the gun itself.

Detective Kirtlan interviewed Isaac after the shooting. The detective told Isaac police had found the 10-millimeter handgun and the 9-millimeter magazine, but were still looking for the 9-millimeter handgun. He also explained it was a "public safety issue" to have a gun left out on the street, especially since there would be children walking down that street on their way to school the next morning. Isaac then discussed the matter with his stepmother, who had joined him in the interview room, and ultimately agreed to point out the location of the missing handgun. The detective brought in a map of the area and Isaac pointed out the location he believed "they threw it out."

The prosecution moved in limine to be allowed to elicit testimony from Detective Kirtlan that Isaac told him the location he believed police would be able to find the gun, despite the fact Isaac "arguably" invoked his right to remain silent under *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (*Miranda*) prior to providing the location, under "the 'public safety' exception to the *Miranda* rule."[9] The prosecutor explained: "What I proposed rather than playing the tape was to ask Detective Kirtlan did you receive information from [defendant] Isaac Vasquez as to where you

---

[9] Because Isaac's argument on appeal does not claim a *Miranda* violation occurred, we do not set forth the parties' arguments regarding this issue.

might find the missing nine millimeter gun?  Yes.  Did you look for it in that location?  Yes.  Did you find it?  No."

In response, Isaac's trial counsel argued:  "I think that there is . . . [an Evidence Code section] 356 problem.  I think that the throwing of the gun is being used to show consciousness of guilt, whereas Isaac's statement during this long period that he was interrogated and questioned was that this was self-defense.  So I think that you need to get in the entire statement so that the jury could, in essence, understand that."  Counsel also expressed concern that limiting the testimony to Isaac providing the location of the gun "gives a false impression that if he's saying where the gun was thrown, then it gives the impression that he threw the gun, and that's a significant issue."

The prosecutor argued in reply:  "As far as [Evidence Code section] 356, I don't know that there is anything in his self-serving statements to [Isaac's stepmother] or even his inculpatory statements to [his stepmother] that explained the limited part that I'm trying to get out, where could they look for the gun.  [¶]  One of the things that has already been raised here by [counsel for Jesse] is that the police didn't do their job, didn't look for the .40 caliber, didn't even bother to look for the .40 caliber, didn't even bother to find it.  Now, that's the one that was used by Latrele Neal.  But it should at least be shown that the officers made attempts to find the outstanding nine millimeter.  [¶]  Because one of the other arguments counsel can make, well, maybe if we had the nine millimeter we could have -- if they had done their job and looked for that maybe we could have done some testing on that or figured out which one of them fired it.  There's nothing in any of the witness statements, even the witnesses who saw the ten millimeter being thrown from the car that indicates who in the car threw it.  [¶]  Now, in his statement, that portion of it I think he indicates or the officer indicates that it was thrown from the driver's side window.  I'm not implying that we know who threw the gun.  I'm simply trying to get before the jury that the officers attempted to locate

42

it. They attempted to get information. They got information, and they went to look for it. But there's nothing in the statements that he makes to [his stepmother] or the lies that he makes to Detective Kirtlan initially that explains that or adds to it or clears anything up."

The trial court ruled that admitting the fact Isaac provided the location of the gun to police would not violate *Miranda*. The trial court further ruled Evidence Code section 356 did not require "allowing an entire expansive rambling statement encompassing a number of topics to address a sole and easily isolated question such as we have in this case." Finally, the court explained the prosecution's intended use of Isaac's statement as to the location of the 9-millimeter handgun did not "over-implicate" Isaac or "misrepresent" he was the one who threw the gun out of the Explorer.

In accordance with the trial court's ruling, during the prosecution's examination of Detective Kirtlan, the following exchange occurred:

"Q      Did you receive information from [defendant] Isaac Vasquez about the location of a missing nine-millimeter semiautomatic handgun?

"A      Yes, I did.

"Q      Did you go to the area after receiving that information and search the area where it was thought that that gun might be?

"A      Yes, ma'am.

"Q      And where was that location?

"A      Essentially in the area of Northgate and Striker in North Sacramento.

"Q      Now, is that an area where other evidence had been located?

"A      Yes, ma'am.

"Q      What other evidence had been located there?

"A      A magazine to a nine-millimeter semiautomatic handgun.

"Q      Did you find the nine-millimeter semiautomatic handgun?

43

"A    No, we did not."

**B.**

*Analysis*

Evidence Code section 356 provides:  "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole *on the same subject* may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  (Italics added.)

This provision "is sometimes referred to as the statutory version of the common-law rule of completeness.  [Citation.]  According to the common-law rule:  '"[T]he opponent, against whom a part of an utterance has been put in, may in his [or her] turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect of the utterance."  [Citation.]'  [Citation.]"  (*People v. Parrish* (2007) 152 Cal.App.4th 263, 269, fn. 3.)  The purpose of the rule "is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.  [Citation.]  Thus, if a party's oral admissions have been introduced in evidence, he [or she] may show other portions of the same interview or conversation, even if they are self-serving, which 'have some bearing upon, or connection with, the admission . . . in evidence.'  [Citations.]"  (*People v. Arias* (1996) 13 Cal.4th 92, 156.)  We review the trial court's determination of whether or not to admit evidence under this provision for abuse of discretion.  (See *People v. Pride* (1992) 3 Cal.4th 195, 235.)

Here, Detective Kirtlan testified Isaac told him where the 9-millimeter handgun could be found, and after receiving this information, he went to a certain location where police found a magazine to a 9-millimeter handgun, but not the gun itself.  Implicit in this

44

testimony is that Isaac told the detective the gun could be found at that particular location. From this, and the fact the location was along the chase route, the jury could infer *someone* in the Explorer threw the gun out of the vehicle during the chase. The testimony does not reveal who threw the gun. Thus, the concern raised below that the testimony would misleadingly suggest Isaac was the one who threw the 9-millimeter handgun, and therefore likely fired the shot that killed Ellison, was obviated by the actual testimony received into evidence. Indeed, the prosecutor never argued, in either her closing or rebuttal argument, that Isaac fired the fatal shot. Instead, she specifically conceded, "we don't know who had the nine and who had the ten."

The other argument for admission of the entire statement, which was raised below, was the jury should hear the entirety of Isaac's statement, including the portion indicating the shooting was done in self-defense, to balance out the suggestion that throwing the gun out of the Explorer evidenced Isaac's consciousness of guilt. However, the trial court appeared to credit the prosecutor's assurance Isaac's statement as to where the 9-millimeter handgun could be found was being offered solely on the issue of whether the police conducted a thorough investigation. (See 4 Jones on Evidence (7th ed. 2014) § 24:26 ["where the defendant challenges the investigation as unprofessional or sloppy or claims that he [or she] was falsely accused, the prosecutor should be entitled to spell out the investigation in greater detail to rebut this defense"].) The prosecutor lived up to this assurance. At no point in her arguments to the jury did she argue the fact Isaac threw a handgun from the SUV evidenced his consciousness of guilt. Moreover, the rule of completeness prevents "'the use of selected aspects of a [statement] so as to create a misleading impression *on the subjects addressed*,'" and therefore "hinges on the requirement that the two portions of a statement be '*on the same subject*.'" (*People v. Vines* (2011) 51 Cal.4th 830, 861, italics added.) Here, whether Isaac told Detective Kirtlan where to find the 9-millimeter handgun is not the same subject as whether the

45

shooting itself was done in self-defense. We acknowledge narrow lines should not be drawn around the exact subject of inquiry (*People v. Zapien* (1993) 4 Cal.4th 929, 959), but the statutory language "on the same subject" cannot be rendered meaningless by an interpretation that draws no lines at all. (Evid. Code, § 356.)

Finally, we note Isaac raises a separate issue for the first time on appeal. He argues his exact statement to Detective Kirtlan, i.e., "they throwed it out" should have been admitted because it "was exculpatory in that it supported an inference that [Isaac] did not shoot the [9-millimeter] gun that killed Ellison." Acknowledging admission of Isaac's statement, "they throwed it out" at the joint trial in this case, where Isaac did not testify, would have potentially violated his codefendants' confrontation rights under *People v. Aranda* (1965) 63 Cal.2d 518 and *Bruton v. United States* (1968) 391 U.S. 123 [88 S.Ct. 1620, 20 L.Ed.2d 476], Isaac argues the redaction of this statement to simply indicate he told Detective Kirtlan where the gun could be found prejudiced his defense. This argument is forfeited for failure to raise it in the trial court. (See *People v. Hill* (1992) 3 Cal.4th 959, 994-995, overruled on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1075.)

The trial court did not abuse its discretion in ruling Evidence Code section 356 did not require admission of Isaac's entire statement to Detective Kirtlan.

# VIII

## *Cumulative Prejudice*

Finally, we reject Isaac's assertion the cumulative effect of the foregoing assertions of error require reversal. We have reversed Isaac's gang enhancement and vicarious firearm enhancement findings. This does not, however, affect Isaac's convictions or remaining enhancement findings. The only other meritorious claim of error, i.e., the instructional error, we concluded was harmless. Accordingly, there is no prejudice to cumulate.

46

## DISPOSITION

The judgments entered against defendants Jesse Cornejo, Adam Cornejo, and Isaac Vasquez are modified to strike the gang enhancement findings under Penal Code section 186.22, subdivision (b), and vicarious firearm enhancement findings under Penal Code section 12022.53, subdivision (e)(1), as well as the sentences imposed thereon. As modified, the judgments are affirmed. The trial court is directed to amend the respective abstracts of judgment to reflect the modifications and to indicate the victim restitution order imposed as to each defendant is a joint and several obligation and to forward a certified copy of the amended abstracts of judgment to the Department of Corrections and Rehabilitation.

/s/

HOCH, J.

We concur:

/s/

HULL, Acting P. J.

/s/

MURRAY, J.