Filed 6/7/22  P. v. Ybarra CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANDRES YBARRA,<br><br>    Defendant and Appellant. | D079879<br><br><br><br>(Tulare Super. Ct. No. VCF337670) |

APPEAL from a judgment of the Superior Court of Tulare County, Juliet L. Boccone, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans and Henry J. Valle, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Andres Ybarra of second degree murder after his girlfriend Ruby L. was found dead lying in bed with visible bruising on her arm and forehead, a swollen nose, and blood on the pillow. The autopsy indicated that Ruby died from strangulation and complications from multiple blunt force trauma, but potentially fatal levels of prescription drugs were also found in her system.

Ybarra raises three broad evidentiary challenges on appeal. He contends the trial court erred in admitting previously suppressed evidence found on Ruby's cell phone, excluding evidence that the pathologist who did Ruby's autopsy had a prior misdemeanor DUI conviction, and excluding various evidence probative of Ruby's alleged past prescription drug abuse. We reject each of these claims, finding either no error or no prejudice. We likewise conclude there was no cumulative error depriving Ybarra of a fair trial. Turning to his sentencing claim, we conclude Ybarra's challenge under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*) is forfeited because he failed to object to a $4,500 restitution fine. Accordingly, we affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

Responding to an emergency call on the morning of July 1, 2016, officers from the Visalia Police Department arrived at a residence to find Ruby deceased on the bed. Her body was stiff and cold to the touch, suggesting she had been dead for some time. She had a black left eye, swelling and bleeding from her nose, and bruises on her arms, forehead, and temple area. A blood spot was found on her pillow. There was also bruising on her stomach, which seemed suspicious and concerning to police. Officers

2

took photographs and spoke to Ybarra and his mother, who were at the scene. Ybarra had visible red marks near the knuckles on his right hand.

Ybarra told Detective Ramona Whaley that he and Ruby had been dating for five years. Coming home from work around 10:30 p.m. on June 30, he said he saw his two-year-old son in the bathtub with water overflowing from the tub and coming up to his neck.[1] Ruby was sitting back on the toilet, mumbling. When Ybarra asked what was wrong with her, she said, " 'Soma' " (a muscle relaxant). Concerned about Child Protective Services (CPS), Ybarra grabbed his son and left the house to a nearby park to pray all night that Ruby would be safe. He tried calling his mother numerous times using Ruby's cell phone.

Continuing his story, Ybarra told Whaley he returned home the next morning, unlocked the door, charged the phone for a few minutes, and saw Ruby lying unresponsive in bed with their baby. Scared, he returned to the park and again tried numerous times to reach his mother, Emma.[2] He claimed he did not call police because his child had previously been taken by CPS. Eventually reaching Emma, he told her Ruby may have overdosed and asked her to come get him. Ruby looked fine to Ybarra when he left for work around 3:00 p.m. on June 30 and again when he returned around 10:30 p.m. that night.

Emma told police that her son and Ruby were in a relationship and had been living together. She admitted Ybarra calling her multiple times on June

---

[1] Officers observed no sign of any wet towels or clothing suggesting the tub had overflowed. Several days later, in executing a search warrant of the residence, officers were unable to make the bathtub fill past the overfill valve.

[2] Because Emma shares defendant's last name, we refer to her by her first name to avoid confusion and intend no disrespect.

30 using Ruby's cell phone. Emma called 911 that morning after picking him up from a relative's house. She deleted her call history so her daughter would not think she was in contact with Ruby.

Officers treated the death as suspicious and a possible homicide but needed an autopsy to determine how Ruby died. Ybarra gave detectives Ruby's cell phone but claimed not to have the passcode for it. He signed a written consent form agreeing to a full search. Call history extracted from the phone later by warrant revealed that Ybarra had called Emma 24 times from 10:40 p.m. into the next morning, with a period of no activity between midnight and 6:00 a.m.[3] Around 7:00 a.m., a call was made on Ruby's phone to Ybarra's place of employment.

Pathologist Dr. Gary Walter performed an autopsy on July 5. Ruby's body was bruised all over—there were 20 bruises on the trunk of her body and bruises scattered throughout her head, face, arms, chest, and legs. There was an abnormal hemorrhage on the surface of the neck, indicative of a crushing injury to the jugular veins. Higher in the neck, Ruby's hyoid bone was bent backwards and fractured to one side, indicative of strangulation. A chest X-ray revealed broken ribs caused by blunt force trauma to the ribcage. There was also injury to the liver and kidneys indicative of blunt force trauma.

Based on these findings, Walter concluded that Ruby died from manual strangulation, with multiple blunt force trauma to her abdomen, lower chest, and head contributing to her death. He believed the bruising and internal

---

[3] Pictures and Internet search data recovered from the cell phone were suppressed before trial under the Electronic Communications Privacy Act, or ECPA (§ 1546.4), as exceeding the scope of the warrant. Some of this suppressed evidence was later admitted at trial after the court concluded that the defense had opened the door. To avoid repetition, we discuss the contents of the phone and the court's rulings in our analysis of Ybarra's claims.

injuries on Ruby's body were indicative of some form of beating. Even so, blood and gastric samples tested positive for potentially fatal levels of valium, hydrocodone, and soma—drugs that could have a multiplier effect when taken in combination.

Visalia police officers searched the residence pursuant to a warrant on July 6. Ybarra was arrested that same day and had "drastically" changed his appearance since July 1. His hands remained slightly discolored.

On July 10, 2017, the Tulare County District Attorney charged Ybarra by information with premeditated and deliberate first degree murder (Pen. Code, § 187, subd. (a)) with the special circumstance allegation that the murder was done by torture (Pen. Code, § 190.2, subd. (a)(18)).[4] A defense suppression motion was granted in December 2018 as to some of the evidence obtained from Ruby's cell phone.

A 16-day jury trial began in late August 2019. The People's evidence described how the investigation unfolded and zeroed in on Ybarra after autopsy results showed a homicide. Several witnesses presented evidence of past acts of domestic violence perpetrated by Ybarra (Evid. Code, § 1109).[5] The defense largely focused on shortcomings in the investigation and autopsy to suggest guilt could not be proven beyond a reasonable doubt. Defense expert Dr. Stephen Avalos testified that Dr. Walter did not follow standard procedures and questioned his conclusion of strangulation. But he conceded blunt force trauma played a significant role in Ruby's death.

---

[4] Further undesignated statutory references are to the Penal Code. A separate charge of felony child abuse (§ 273a, subd. (a)) was dismissed before trial.

[5] To avoid repetition, this evidence will be discussed in connection with Ybarra's claim that admitting suppressed evidence recovered from Ruby's cell phone was prejudicial error.

Following deliberations, the jury acquitted Ybarra of first degree special circumstance murder but convicted him of the lesser included offense of second degree murder. On December 23, 2019, the court sentenced Ybarra to an indeterminate term of 15 years to life. It imposed a $4,500 restitution fine (§ 1202.4), a stayed parole revocation fine in the same amount (§ 1202.45), a $40 court security fee (§ 1465.8), and a $30 conviction assessment (Gov. Code, § 70373).

## DISCUSSION

Ybarra raises several evidentiary claims on appeal. First, he argues the trial court abused its discretion in admitting evidence collected from Ruby's cell phone that was previously suppressed upon finding that the defense had "opened the door" to its admission. To the extent this was proper, Ybarra maintains that defense counsel rendered constitutionally ineffective assistance by opening the door to its admission. We reject both of these contentions, finding any error harmless in light of the fact that the cell phone pictures of Ruby's injuries and her browser search history regarding domestic violence was largely cumulative of (1) the ample evidence at trial that there was violence in their relationship, and (2) the autopsy results revealing multiple blunt force trauma contributing to Ruby's death. We likewise conclude no error occurred in excluding evidence regarding Dr. Walter's past DUI conviction or evidence bearing on Ruby's past drug use. Finally, we reject Ybarra's claim of cumulative error and conclude his *Dueñas* challenge is forfeited.

A.    *Any error in admitting previously suppressed cell phone evidence was harmless.*

A highly contentious exchange ensued when the court found that defense counsel opened the door to admitting previously suppressed evidence.

6

Through days of argument and motions, defense counsel unsuccessfully tried to keep out evidence recovered from Ruby's cell phone. On appeal, Ybarra contends the trial court abused its discretion in allowing the previously suppressed evidence to come in. To the extent the court did not err, Ybarra claims he received constitutionally ineffective assistance of counsel. We reject both contentions, concluding that even if error occurred, it was harmless.

1.  *Additional Background*

Nearly a year before trial, Ybarra filed a motion to suppress certain evidence—pictures of Ruby's past domestic violence injuries and searches on Ruby's phone pertaining to domestic violence—as exceeding the scope of the search warrant. Judge Kalashian agreed that the ECPA required suppression. (§ 1546.4.) When the People sought a new search warrant to seize the previously suppressed evidence, the court granted Ybarra's second motion to suppress. During pretrial hearings, the court warned the defense it could risk opening the door depending on how far it went in painting the investigation as shoddy.

On the third day of witness testimony (August 30), defense counsel cross-examined lead detective Whaley about why police had zeroed in on Ybarra as their suspect. Counsel asked if police considered any other suspect, or whether Ruby could have been in another relationship. Whaley replied that nothing in her cell phone suggested another relationship and that there was no evidence Ruby had a second phone. Counsel then noted that Ybarra had signed a written consent form agreeing to a full search of both the residence and Ruby's phone, without limitation, and that consent was never withdrawn.

7

This line of inquiry prompted lengthy and repeated sidebars outside the jury's presence between counsel and the court. The prosecutor argued it was misleading to suggest that someone else could have entered and committed the crime, or that there should have been further investigation into this possibility. Once the police viewed the suppressed evidence on Ruby's phone that her boyfriend was beating her, it was clear who to target. The court agreed that the defense could not elicit the inference that the police did not properly investigate a lead on Ruby's phone despite Ybarra's consent when it knew for a fact the police did investigate that lead but the evidence had been suppressed. Berating the investigation, while knowing there was suppressed evidence explaining why police chose to focus on Ybarra impermissibly used the suppression ruling offensively as a sword. It was improper in the court's view for the defense to suggest things did not happen that it knew actually occurred.

Ybarra's two defense attorneys disagreed that the door had been opened. In their view, the suppression ruling did not preclude the defense from exposing flaws in the police investigation. It was permissible to explore whether Whaley had looked through the *call records* (and not the suppressed photos or web searches) to determine if Ruby had another boyfriend. Counsel claimed their questioning did not veer into clearly impermissible territory, e.g., by suggesting Whaley had no other evidence suggesting Ybarra injured her. To the extent they did open the door, counsel suggested the remedy was not admission but rather a limiting instruction. Asserting this was "somewhat devastating" to the defense case, the trial court directed the court reporter to provide each side a rough transcript and for arguments to resume the next day.

8

The following court day (September 3), the parties reiterated their positions. The court explained its view that although the defense could find fault with the police investigation, it could not "knowingly question an investigator about the lack of an investigation that they knew was done." In terms of remedies, the court believed that once the door was opened, the evidence could then be used. Defense counsel indicated that it planned to seek writ review and, if summarily denied, file a mistrial motion on the basis of ineffective assistance of counsel. While counsel did so, the People resumed their case-in-chief.

The parties discussed the matter again on September 5. Defense counsel asked whether any error could not be cured by a simple clarifying question to Detective Whaley. The court rejected that approach because it would not alleviate the inferences drawn from the questions asked. It suggested the parties could work out by stipulation what evidence would come in.

On September 6, the court indicated that it would allow the prosecution to introduce eight photos from Ruby's phone and general testimony that her search history was about domestic violence. Based on this evidence Whaley could testify why she did not suspect anyone other than Ybarra.

Consistent with the court's ruling, Detective Whaley took the stand for her redirect examination at the close of the People's case. She was asked why the police focused on Ybarra. Whaley replied that the autopsy result revealed the death was a homicide, not an overdose, and cell phone "selfie" pictures stored on Ruby's phone depicted past domestic abuse. Moreover, the web searches on Ruby's phone made specific reference to domestic violence and types of injuries.

9

2.    *Legal Principles*

The ECPA restricts a government entity's ability to access "electronic device information."  (§ 1546.1, subds. (a)(3).)  Such information may be gathered pursuant to a warrant, with "the specific consent of the authorized possessor of the device," or through limited other means.  (§ 1546.1, subd. (c)(4).)  "Any person in a trial, hearing, or proceeding may move to suppress any electronic information obtained or retained in violation of the Fourth Amendment to the United States Constitution or of this chapter [ECPA, § 1546 et seq.]"  (§ 1546.4, subd. (a).)  The usual procedures for suppression motions, as set forth in section 1538.5, subdivisions (b) through (q), apply.  (*Ibid.*)

"A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.) When a party opens the door to particular testimony, the court has discretion to permit further inquiry on the subject "to present a more balanced picture" to jurors. (*People v. Melendez* (2016) 2 Cal.5th 1, 29; see, e.g., *People v. Payne* (Ill. 1983) 456 N.E.2d 44, 46 [where defense counsel's cross-examination created the unmistakable impression that nothing was recovered in searching defendants' apartment connecting them to a robbery, trial court did not err in concluding the defense "opened the door" and allowing the prosecution to introduce evidence of a handgun that had previously been suppressed]; accord *People v. Johnson* (2010) 183 Cal.App.4th 253, 284; see also *People v. Varona* (1983) 143 Cal.App.3d 566, 569–570 [it is misconduct to comment on an adversary's failure to produce evidence known to have been excluded by the court].)

10

3.    *Analysis*

The parties dispute whether defense counsel opened the door to the admission of the previously suppressed photos and Internet searches on Ruby's cell phone. Ybarra maintains that a careful analysis of his attorney's questions to Whaley reveals that he was exploring the thoroughness of the investigation *before* searching Ruby's cell phone, without opening the door to any inferences as to what was recovered on the phone itself. In the People's view, defense counsel's questioning gave the false impression that officers had unfettered access to the cell phone and failed to adequately investigate other potential leads.

We need not resolve this dispute because any error in admitting the suppressed cell phone evidence was harmless. "Ordinarily, the erroneous admission of evidence is reviewed for prejudice under the standard described in *People v. Watson* (1956) 46 Cal.2d 818 [(*Watson*)], which requires reversal only if the defense shows it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Roberts* (2017) 13 Cal.App.5th 565, 576.) "However, when the error involves a defendant's federal constitutional rights . . . , the error is reviewed for prejudice under the standard described in *Chapman v. California* (1967) 386 U.S. 18, 24 [(*Chapman*)]," which asks a reviewing court to evaluate whether it can say beyond a reasonable doubt that the erroneous admission of evidence did not contribute to the jury's guilty verdict. (*Roberts*, at pp. 576–577.)

Ybarra acknowledges that his claim of evidentiary error "involves application of state law" but nevertheless contends that prejudice should be evaluated under the *Chapman* standard for federal constitutional error. He believes that admitting the suppressed photos and web searches from Ruby's

11

phone rendered his trial fundamentally unfair. Despite other evidence of domestic violence introduced at trial, Ybarra claims "it was the previously suppressed evidence that was most important to the prosecution case." In his view, the evidence not only established a recent history of domestic abuse, it blunted defense attack on the police investigation. Given how hard the prosecution fought for its admission and the fact that the illegally obtained cell phone data is what led to Ybarra's arrest, he suggests any error in its admission is necessarily prejudicial.

We disagree with Ybarra that *Chapman* applies. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*." (*People v. Partida* (2005) 37 Cal.4th 428, 439.) "Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict would have been more favorable to the defendant absent the error." (*Ibid.*) "For example, even the improper admission of evidence of uncharged crimes committed by the defendant does not ordinarily amount to constitutional error." (*People v. Covarrubias* (2011) 202 Cal.App.4th 1, 20 (*Covarrubias*).) Where the challenged testimony "was far from the primary evidence of [defendant's] guilt" and "merely corroborated a reasonable inference that the jurors likely would have drawn without such testimony," it does not rise to the level of a constitutional due process violation. (*Id.* at pp. 20–21; compare *People v. Wang* (2020) 46 Cal.App.5th 1055, 1080 [no due process violation from erroneous admission of double hearsay statements where the record contained ample other evidence on defendant's threats] with *People v. Albarran* (2007) 149 Cal.App.4th 214, 227 [due process violation occurred

12

where highly inflammatory gang evidence unrelated to the charged offenses was admitted solely to prove motive and intent].)

Although the cell phone evidence was obviously helpful to the prosecution's case, its admission did not implicate due process where it merely buttressed evidence that Ruby death was caused by Ybarra's assaultive blows. Autopsy results indicated that Ruby died from strangulation, complicated by multiple blunt force trauma indicative of a beating. Ybarra was the last person known to have been with her; after leaving the apartment with their young child, he spent the night in a park and frantically dialed his mother. He did not call 911; his mother did. They returned to the apartment and unlocked the door; neither they nor law enforcement found any sign of forced entry. A technician who photographed Ybarra's hands noticed slight discoloration or redness near the second or third knuckle. Here, as in *Covarrubias*, the suppressed evidence merely corroborates a reasonable inference that jurors likely would have drawn from other testimony. (202 Cal.App.4th at pp. 20−21.) Any evidentiary error did not render Ybarra's trial fundamentally unfair.

Applying the applicable *Watson* test for prejudice, any evidentiary error was plainly harmless. There is no reasonable likelihood that the jury would have reached a more favorable outcome had Whaley been barred from introducing cell phone photos and search history. Apart from the autopsy results and timeline of events on June 30, jurors heard abundant evidence documenting the violent nature of Ybarra's dating relationship with Ruby. (See Evid. Code, § 1109.) Visalia Police Department Officer Jason McWilliams saw Ybarra appear to wrestle Ruby in a shopping mall in June 2013. When McWilliams drew his firearm, Ruby ran toward police vehicles, telling officers that Ybarra had grabbed her by the arm and dragged her

13

across the street when she tried to leave. Officer Jeff Dowling recalled a separate incident in which Ybarra came up behind a pregnant Ruby on a skateboard, grabbed her by the hair, and started pulling her. Ruby told officers she agreed to go with him to avoid harming the baby. But when she refused along the way to move back in with Ybarra, he pushed her to the ground, jumped on, and possibly bit her. After this incident, Ruby obtained a protective order against Ybarra.

Relatives offered similar accounts. Ruby's aunt said that three months before her death, Ruby came to her crying with bruises on her arms and legs saying Ybarra had hit her. A cousin reported seeing Ruby with a black eye in the days before her death. And Ruby's grandmother described seeing Ybarra behave aggressively five or six months before her death. Ruby called, asking her to pick her up from Ybarra's apartment. When the two got into the van, Ybarra tried to pull Ruby out of the passenger seat and prevent her from leaving. Throughout the time Ruby dated Ybarra, her grandmother observed her with bruised arms and big patches of hair missing from her head.

Family and officer accounts painted an unmistakable picture of a relationship marred by violence. Against this undisputed testimony, photos of past injuries and web searches on domestic violence added little. To the extent the pictures were more inflammatory than existing witness accounts, the jury's acquittal on first degree special circumstance murder suggests it was capable of dispassionately considering the evidence to reach its verdict. There is no reasonable probability that Ybarra would have obtained a more favorable verdict had the challenged evidence been excluded.

Our conclusion that any evidentiary error was harmless likewise disposes of Ybarra's ineffective assistance claim. Because there was plentiful evidence of domestic violence in the dating relationship as well as undisputed

14

evidence that Ruby suffered multiple blunt force trauma before her death, there is no reasonable probability that any deficiency in counsel's performance affected the jury's verdict. (See *Strickland v. Washington* (1984) 466 U.S. 668, 686 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 217–218.)

B.    *The court did not err in excluding particular defense evidence.*

Ybarra next challenges two sets of pretrial evidentiary rulings that he contends denied him a fair trial. First, he argues the court erred in excluding evidence that the pathologist who performed Ruby's autopsy was previously convicted of a misdemeanor DUI. He also claims it was error to exclude evidence bearing on Ruby's past prescription drug use. We reject both arguments, finding neither error nor impact on Ybarra's constitutional rights.

1.    *Legal Principles*

Only relevant evidence is admissible (Evid. Code, §§ 350, 351)—i.e., evidence having some tendency in reason to prove or disprove a material fact (*id.*, § 210). Although trial courts have wide discretion to determine the relevance of evidence, they have *no* discretion to admit irrelevant evidence. (*People v. Guillen* (2014) 227 Cal.App.4th 934, 1019.) Even where evidence is relevant, a trial court has broad discretion to exclude it from trial under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (See generally *People v. Pride* (1992) 3 Cal.4th 195, 235.)

As a general rule, application of the ordinary rules of evidence does not infringe on a defendant's constitutional right to present a defense. (*People v. Cunningham* (2001) 25 Cal.4th 926, 998 (*Cunningham*).) Nevertheless

15

"Evidence Code section 352 must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense." (See *id.* at pp. 998–999.) In striking this balance, "the complete exclusion of evidence intended to establish an accused's defense may impair his or her right to due process of law, [whereas] the exclusion of defense evidence on a minor or subsidiary point does not interfere with that constitutional right." (*Ibid.*, citing *People v. Fudge* (1994) 7 Cal.4th 1075, 1103.) "For a defendant's constitutional rights to override the application of ordinary rules of evidence, ' "[T]he proffered evidence must have more than "slight-relevancy" to the issues presented. . . . The proffered evidence must be of some competent, substantial and significant value." ' " (*People v. Anderson* (2012) 208 Cal.App.4th 851, 880.)

> 2.    *DUI Evidence*

Before trial, the prosecution moved to exclude evidence that the pathologist who performed Ruby's autopsy had a prior misdemeanor DUI conviction. The defense agreed that a misdemeanor DUI was not a crime of moral turpitude to be admissible for impeachment. (See generally, *People v. Harris* (2005) 37 Cal.4th 310, 337.) Instead, counsel believed the evidence was admissible because it bore on Dr. Walter's "competence and his professionalism."

Defense counsel made an offer of proof that nearly four months before Ruby's death, Dr. Walter had been arrested for a misdemeanor DUI while on his way to perform a different autopsy for the county. Walter allegedly drove drunk with a blood alcohol level of 0.19 percent while "en route to perform autopsies," hit another car, drove home another two and a half miles, and gave "very fanciful statements at his disciplinary hearing under oath" about how much he had consumed. Counsel explained that without this evidence,

jurors might assume Walter was competent when there were numerous problems with his autopsy in this case. The DUI evidence would help the jury assess how much weight to place on Walter's autopsy findings. Counsel asserted that the inquiry would take no more than ten to fifteen minutes should the court "have [section] 352 concerns."

The prosecution responded that it would be speculative to assume that Walter would have actually performed autopsies on the day of his DUI arrest. When officers stopped Walter, he indicated he was feeling light-headed and unwell. There was no evidence he had ever performed any autopsies while under the influence or of suspected impairment during past autopsies. If required to rebut the claim, the prosecution would call coroners from Kings and San Luis Counties who were "horribly surprised" by the DUI conviction and prepared to testify that Walter had been "very professional" in their past dealings. As to the professional consequences, Walter's license was merely suspended, and he was not barred from practicing medicine. The prosecutor claimed that Ybarra's team was trying to "drag [Walter] through the mud to bolster their pathologist who is going to come in."

Concluding the evidence was not relevant, the court noted there was no indication Walter was under the influence when he performed Ruby's autopsy. Any bearing on Walter's professionalism and overall skill from a four-month-old conviction was too speculative to be deemed relevant in the court's view. The court reasoned that the "experts should stand on their own as to whether it was a good autopsy or a bad autopsy" and whether Walter had met professional standards. It would not permit the defense to bolster its expert with the DUI evidence, which was not "relevant to the autopsy that occurred."

17

As a second basis for exclusion, the court relied on Evidence Code section 352, reasoning that inquiry into the prior DUI would create "a trial within a trial." Despite defense counsel's assertions to the contrary, the court believed "it would use a lot of time" to explore the issue and be "far more prejudicial than probative."

The court did not err. We sidestep the threshold relevancy issue.[6] Even if the DUI conviction was relevant and probative of Dr. Walter's professionalism, the trial court reasonably excluded it from trial under Evidence Code section 352. Although Ybarra suggests it would take "a matter of minutes" to present the evidence, the prosecution would be entitled to present rebuttal testimony. It was prepared to examine two coroners from other counties who were surprised by the conviction and prepared to testify that Walter had been very professional in handing autopsies for them in the past. The prosecutor also raised questions as to whether Walter would have actually performed any autopsies that day based on his statement to law enforcement that he felt lightheaded and unwell.

Given this proffer, the court reasonably determined that a detour into whether Walter would have performed an autopsy that day or whether he was generally professional in performing autopsies would derail trial proceedings. (See *People v. Verdugo* (2010) 50 Cal.4th 263, 290–291 [no error in excluding evidence that detectives involved in defendant's capital murder

---

6    According to the People, the fact that Dr. Walter once drove under the influence while on his way to perform a different autopsy supported at best a speculative inference that he handled *Ruby's* autopsy unprofessionally or incompetently four months later. Ybarra disagrees, citing professional discipline cases for the notion that past alcohol convictions rationally bear on a physician's general fitness to practice medicine. (*Griffiths v. Superior Court* (2002) 96 Cal.App.4th 757, 770–771; see also *Walker v. Physical Therapy Bd. of Cal.* (2017) 16 Cal.App.5th 1219, 1231–1232.)

case had been accused and later exonerated of fabricating evidence in a different case].) Moreover, it reasonably found that admitting the DUI conviction would be "far more prejudicial than probative" where the defense could contest the autopsy findings in other ways. As the court noted, the defense expert could point to shortcomings in the autopsy through its expert without needing to resort to the DUI.[7] Not only was there no error in excluding the proffered evidence under Evidence Code section 352, the evidence lacked *significant* probative value and excluding it did not implicate Ybarra's due process rights. (See *Cunningham, supra,* 25 Cal.4th at pp. 998−999.)

3. *Drug-related Evidence*

Ybarra raises a separate due process challenge as to the trial court's exclusion of evidence bearing on Ruby's prescription drug use. The court excluded evidence that Ruby's mother and aunt both recently died from drug overdoses, as well as the evidence that Ruby made several phone calls to a medical clinic on the day that she died. Finally, the court admitted a *portion* of Ybarra's statement to police explaining why he left Ruby in that state on June 30 but excluded his explanation that Child Protective Services (CPS)

---

[7]    This is indeed what happened. Although Ybarra claims the court placed a "crippling limitation on presenting evidence relevant to Dr. Walter's credibility," the defense presented *ample* evidence at trial that more directly challenged Walter's qualifications and competence. The defense pathologist probed Walter's lack of board certification, his failure to perform a standard neck dissection, and his conclusion that a strangulation occurred despite petechial hemorrhaging appearing on only one side. On cross-examination, Walter was likewise asked about the status of his medical license and admitted he was on probation with the medical licensing board. Thus, the evidence presented at trial would eliminate prejudice under any applicable standard even if error had occurred.

had previously been involved *because* Ruby had overdosed. We find no error in these rulings, nor a denial of denial of Ybarra's due process rights.

i.    *Additional Background*

Before trial, the prosecution filed a motion in limine seeking to exclude any mention of Ruby's past use of prescription drugs as irrelevant. Defense counsel responded that Ruby's past prescription drug use was probative of whether she died by a drug overdose. The fact that Ruby's prescriptions had expired suggested she obtained the drugs in her system *illicitly* and was associating with someone potentially dangerous who could be the potential killer. When the court pointed out that Ruby might have gotten the drugs from her mother just as easily as from a drug dealer, counsel claimed it was also relevant that Ruby's mother had died of a drug overdose. In counsel's view, Ruby's past drug use went not only to the manner of death but also to the reasonableness of Ybarra's actions in taking his son and leaving the house despite Ruby's state.

The prosecutor responded that defense counsel's other suspect theory was "wildly speculative" absent any idea where Ruby had gotten the drugs in her system. Even if Ruby had overdosed, it would not explain her internal injuries that caused her death. In the prosecutor's view, evidence regarding Ruby's past prescription drug use was not relevant, merely attacked her character, and would "create a separate trial within our trial."

Defense counsel then made an additional proffer that while Ybarra was at work on June 30, Ruby made "numerous calls" to a medical clinic "as if she was trying to get drugs at that point, but not able to." The prosecutor dismissed this too as speculative.

The court eventually ruled that the defense could establish that Ruby last had a valid prescription for the drugs found in her system in November,

20

seven or eight months before she died. Otherwise, it would not allow speculation as to how Ruby might have acquired the drugs she had ingested the night she died.

During subsequent pretrial proceedings, the parties discussed what to redact from Ybarra's recorded interview with Detective Whaley on July 1. The prosecution stated it did not intend to play the full two hour recording but rather planned to elicit portions of Ybarra's account when Whaley took the stand. Invoking the rule of completeness (Evid. Code, § 356), defense counsel responded that the full statement should be played. Without it, counsel believed the jury would have no explanation for why he left the house without calling paramedics on seeing his girlfriend in a "nearly catatonic state." Ybarra's statement to Whaley that his son had been taken from them before, and he feared it would happen again, filled this gap.

Ultimately the court permitted Whaley to testify as to Ybarra's concern about avoiding another interaction with CPS, but it excluded his statement that CPS became involved the last time because Ruby had overdosed. The rule of completeness required admitting Ybarra's statement to Whaley that Ruby " 'took me through this before with [CPS],' " as this would explain his actions in leaving the house. But it would be "a stretch to go beyond that" under Evidence Code section 352; exploring Ruby's past overdose would be minimally probative and "waste a lot of extra time."

At trial, Whaley testified that Ybarra repeatedly voiced concern about losing his child once more to CPS. No evidence was presented as to why CPS had gotten involved. Defense counsel attempted to explore this issue in cross-examining Detective Andrew Salee. After a lengthy sidebar, the court again held that it would permit testimony that there was a prior CPS case, but nothing more. Later, counsel attempted to ask Detective Jacob Sorenson

21

whether Ruby had made four calls to a medical clinic before Ybarra came home from work. A relevancy objection to this question was sustained. Counsel was prevented from asking Detective Whaley whether she had separately investigated Ruby's past prescription drug use.

Despite the court's rulings, the jury did hear evidence concerning Ruby's prescription drug use and potential overdose. Dr. Walter testified that she had potentially fatal levels of valium, hydrocodone, and soma in her system at the time of her death. The parties stipulated that Ruby had no valid prescription for those medications. Whaley described Ybarra's account of coming home from work to see Ruby sitting on the toilet, mumbling and admitting to using " 'Soma.' " She described his account of calling his mother to say that Ruby may have overdosed. Officers acknowledged that they responded to a possible overdose and were not certain until the autopsy was completed that Ruby's death was a homicide.

ii.    *Analysis*

Ybarra argues the court erred in excluding evidence regarding recent overdose deaths of Ruby's mother and aunt, as well as Ruby's calls to a medical clinic the day that she died. In addition, he suggests the court should have permitted his statement to Whaley that CPS had gotten involved the last time after Ruby overdosed.

We readily dispense of the first two claims. Evidence that Ruby's mother and aunt died of drug overdoses had no tendency in reason to suggest that Ruby likewise died of a drug overdose or that some unknown suspect was responsible for her killing. (Evid. Code, § 210.) That Ruby made four calls to a clinic that day likewise supports only a speculative inference that she was trying to abuse prescription drugs. Ybarra proclaims that "[t]here are only three reasons that a person calls a medical clinic; to get medical

22

assistance, to refill a prescription, and to set up an appointment with a doctor." Because Ruby did not have a current prescription and an appointment could be set up through a single call, he believes the "most logical inference . . . was that [Ruby] was in need of medical assistance." But this is pure speculation; Ruby just as easily might have been trying to reach someone she knew at the clinic. Evidence producing only *speculative* inferences is not relevant evidence (*People v. Kraft* (2000) 23 Cal.4th 978, 1035), and "[a] defendant's rights to due process and to present a defense do not include a right to present to the jury a speculative, factually unfounded inference" (*People v. Mincey* (1992) 2 Cal.4th 408, 442).

We likewise find no abuse of discretion in excluding Ybarra's statement that Ruby's prior overdose led to CPS involvement. Ybarra argues this statement would support the defense position that Ruby "had overdosed the night of this incident" and "could have died as a result of a drug overdose." But any previous overdose by Ruby has no tendency in reason to show that Ruby had overdosed on June 30 or died as a result of a drug overdose. Instead, the inferences Ybarra wished to draw were supported by evidence that was introduced at trial—Ybarra's statement that she sat on the toilet looking disoriented and mumbling about " 'Soma,' " the potentially fatal levels of prescription drugs found in her system, and her lack of a valid prescription for those medications at the time of her death. By contrast, whether Ruby had overdosed in the past supported only a speculative inference that she had overdosed on this occasion or died from a drug overdose. A trial court is not required to admit evidence concerning a victim's drug use that serves little purpose other than to make her look bad. (*People v. Loker* (2008) 44 Cal.4th 691, 735−736; *People v. Hillhouse* (2002) 27 Cal.4th 469, 496.)

23

Nor is the result changed by the rule of completeness. Where part of a conversation "is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party." (Evid. Code, § 356.) The purpose of this rule is to prevent selective use of a conversation or writing to create a misleading impression on the subjects addressed. (*People v. Armstrong* (2019) 6 Cal.5th 735, 786 (*Armstrong*).) Although "narrow lines should not be drawn around the exact subject of inquiry" in determining whether two portions of a statement concern the same subject, "the statutory language 'on the same subject' cannot be rendered meaningless by an interpretation that draws no lines at all." (*People v. Cornejo* (2016) 3 Cal.App.5th 36, 74.) Evidence Code section 356 "applies only to statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130; see also 1 Witkin, Cal. Evidence (5th ed. 2012) Circumstantial Evidence, § 39, pp. 415–416 ["The rule is not applied mechanically to permit the whole of a transaction to come in without regard to its competency or relevancy; other exclusionary rules may bar incompetent parts, and only those relevant to and necessary for an understanding of the part admitted may be introduced."].)

"A trial court's ruling under Evidence Code section 356 is reviewed for abuse of discretion." (*People v. Johnson* (2022) 12 Cal.5th 544, 605 (*Johnson*).) Reviewing a transcript of Ybarra's interview with Detective Whaley, the court examined what evidence could come in at trial. Whaley asked Ybarra what he did after finding Ruby drooling and mumbling about taking soma. Asked whether he just left Ruby sitting there, Ybarra replied "Yeah. . . . Like my instinct was my baby's safety and everything like that.

24

. . . [S]he took me through this before with the CPS." The court reasoned that the rule of completeness required allowing Ybarra's statement that he left Ruby in that state because he was concerned about CPS involvement. But it believed that probing further into what led to the past CPS case (for example, to assess whether Ybarra's concerns were well-founded) would invite a mini-trial on that collateral issue.

The court did not err. Having already admitted Ybarra's account that he came home from work to find his son in an overflowing bathtub with Ruby barely responsive and left in a hurry concerned of CPS involvement, evidence about what led to the past CPS case would add little to explain his actions in leaving the home. It would instead confuse the issues before the jury, painting Ruby in a negative light or invite a substantial detour as the parties litigated whether Ybarra's own conduct contributed to the past CPS case.

This is not a circumstance in which selective redaction "allowed the prosecution to create a misleading impression." (*People v. Armstrong, supra,* 6 Cal.5th at p. 787.) The court reasonably excluded Ybarra's statement that a past overdose led to the prior CPS case. Nor is this the unusual case where application of ordinary evidentiary rules impermissibly infringed on Ybarra's right to present a defense. (*Johnson, supra,* 12 Cal.5th at p. 607.) The proffered evidence lacked *significant* probative value to implicate his due process rights. (See *Cunningham, supra,* 25 Cal.4th at pp. 998–999.)

C.     *There was no cumulative error.*

Combining the effect of the evidentiary rulings above, Ybarra claims that he suffered cumulative error that undermined the fundamental fairness of his trial. "[A] series of errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Having largely found no

error, and concluding any error in admitting the cell phone evidence was harmless, there was no cumulative error that denied Ybarra a fair trial. (See *People v. Jablonski* (2006) 37 Cal.4th 774, 825; *People v. Rundle* (2008) 43 Cal.4th 76, 199.)

D.    *Ybarra forfeited his forfeited his Dueñas challenge.*

Ybarra's final contention is that under *Dueñas, supra,* 30 Cal.App.5th 1157, the trial court violated his constitutional rights by imposing various fines and fees without considering his ability to pay.[8] At a hearing that took place eleven months after *Dueñas* was decided, the court imposed a $4,500 restitution fine (§ 1202.4), a suspended parole revocation fine in the same amount (§ 1202.45), a $40 court security fee ($1465.8), and a $30 conviction assessment (Gov. Code, § 70373).

We reject this claim. The court set Ybarra's restitution fine at $4,500, which was well above the statutory minimum of $300. Section 1202.4, subdivision (c) expressly allowed the court to consider Ybarra's ability to pay in setting the fine above the statutory minimum. Notwithstanding any developments in case law, Ybarra had every incentive under section 1202.4, subdivision (c) to argue he lacked the ability to pay the restitution fine the court imposed. His failure to raise a statutory inability-to-pay challenge forfeits his constitutional claim on appeal. (*People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 (*Gutierrez*).) Having failed to challenge a restitution fine that exceeded the $300 statutory minimum by thousands of dollars, Ybarra likewise forfeited any ability-to-pay challenge as to the remaining $70 in fees and assessments. (*Ibid.*)

---

8    Review remains pending on this issue in *People v. Kopp* (2019) 38 Cal.App.5th 47, review granted November 13, 2019, S257844.

Attempting to avoid forfeiture, Ybarra suggests the excessive fines theory had not been revealed by the cases at the time of sentencing and could not have been anticipated. (See *People v. Cowan* (2020) 47 Cal.App.5th 32, 42, review granted June 17, 2020, S261952.) But whatever the *label* placed on a constitutional claim, a statutory challenge could at all times have been raised. (*Gutierrez, supra,* 35 Cal.App.5th at p. 1033.) His claims of an unauthorized sentence or failure to exercise sentencing discretion are belied by the record where the court imposed a fee toward the middle of the statutory range. (See, e.g., *People v. Lamoureux* (2020) 57 Cal.App.5th 136, 151 [claim that fine was "unauthorized" did not overcome forfeiture].) As to his contention that forfeiture should not apply to deprivations of fundamental constitutional rights, the case law holds otherwise. (*In re Seaton* (2004) 34 Cal.4th 193, 197–198.)

Perhaps anticipating this result, Ybarra argues that defense counsel's failure to raise an ability-to-pay challenge below amounted to constitutionally ineffective assistance. Acknowledging that such claims are traditionally brought by a petition for writ of habeas corpus (see, e.g., *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–277), he argues it may be considered on direct appeal where the record offers no satisfactory explanation or tactical reason for counsel's acts or omissions. He maintains that this is such a case, "as an objection could not hurt and could only help."

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." (*Strickland, supra,* 466 U.S. at pp. 667–668.) This is not a case where defense counsel's conduct was objectively unreasonable. (See, e.g., *People v. Martinez* (2014) 226 Cal.App.4th 1169, 1190.) Counsel may have had reason to believe that

27

Ybarra, who was 35 at the time of sentencing, could pay those fines and fees. (See *People v. Acosta* (2018) 28 Cal.App.5th 701, 706−707.) There was evidence presented at trial that he had worked at Taylor's Hot Dog Stand for at least eight years. One colleague described him as "a good worker" another thought it was "unusual" for him to call in sick. Moreover, "factors beyond a defendant's financial circumstances" may influence defense counsel's decision to object. (*Acosta,* at p. 707.) Because our record does not permit a finding of constitutionally ineffective assistance, we reject Ybarra's alternative argument as to the fines and fees imposed.

DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


DO, J.