Filed 10/13/22  P. v. Jorn CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C093823 |
| Plaintiff and Respondent, | (Super. Ct. No. 16FE010824) |
| v. | |
| JUSTIN VON JORN, | |
| Defendant and Appellant. | |

Defendant Justin Von Jorn and his codefendant Terry Parker Eales were convicted by jury of second degree robbery (count five) and assault with force likely to produce great bodily injury (count six); defendant was also convicted of one count of discharging a firearm at an inhabited dwelling (count one), two counts of assault with a semiautomatic firearm (counts two & three), and one count of possession of a firearm by a convicted felon (count four).  The jury further found various firearm, great bodily injury, and gang enhancement allegations to be true.

These convictions and enhancement findings arose out of two separate but related incidents. Defendant and Eales were Norteño gang members from different Sacramento subsets. The victim of the robbery and aggravated assault, R., was also a Norteño gang member. He was robbed and assaulted after refusing defendant's demand that he pay taxes to the Norteño gang on his drug sales in the neighborhood. In the second incident, two days later, defendant fired multiple rounds at R.'s house while several people were either inside or in front of the house. Fortunately, no one was hit.

In a bifurcated proceeding, defendant admitted he was previously convicted of a strike offense within the meaning of the three strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12),[1] subjecting him to additional punishment pursuant to section 667, subdivision (a)(1). The trial court sentenced him to serve an aggregate determinate prison term of 56 years.

On appeal, defendant contends: (1) we must strike the firearm enhancement attached to count one because violation of section 246 is not included in the list of offenses to which a section 12022.53, subdivision (c) enhancement applies; (2) the evidence is insufficient to support the gang enhancements attached to counts five and six; and (3) Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Assembly Bill 333) applies retroactively to defendant's case and also requires us to strike the gang enhancements.

The Attorney General concedes the first issue. We accept the concession and strike the firearm enhancement attached to count one. With respect to the gang enhancements, we conclude substantial evidence supported these enhancements, as the law defined the enhancements at the time of trial. However, we agree with defendant that Assembly Bill 333, "which amended section 186.22 to impose new substantive and procedural requirements for gang allegations" (*People v. Sek* (2022) 74 Cal.App.5th 657,

---

[1] Undesignated statutory references are to the Penal Code.

665 (*Sek*)), applies retroactively to this case and requires us to also strike these enhancements. On remand, the prosecution shall have the option of retrying defendant on these gang enhancements.

FACTS

The facts of defendant's crimes have already been briefly stated. The nature of the contentions raised in this appeal do not require us to provide greater detail with respect to the shooting incident. However, because defendant challenges the sufficiency of the evidence supporting the gang enhancements attached to counts five and six, involving the robbery and assault on R., we describe this incident in greater detail, focusing on the gang-related nature of these crimes.

In May 2016, R. lived in a north Sacramento neighborhood with his girlfriend and three of her family members. He was a Norteño gang member from the Bay Area and continued associating with Norteño gang members when he moved to Sacramento a few years earlier. In addition to doing odd jobs, R. sold drugs in the neighborhood to make a living.

The record is unclear with respect to whether defendant, Eales, or someone they knew, lived next door to R. But regardless of who lived there, defendant and Eales spent a lot of time there together. They were also Norteño gang members. Defendant was a member of the Varrio Diamond Sacra (VDS) subset of the Norteño gang. Eales was a member of the Varrio Garden Land (VGL) subset. They were both what the prosecution's gang expert referred to as "original gangsters," or "OG," each having been a Norteño gang member for at least a decade prior to the crimes in this case. Indeed, after their arrests in this case, they each became the "Authority in Charge" of the Norteño gang members in their respective housing units at the jail. More on this will be discussed later.

Returning to the incident involving R., sometime before the robbery and assault, defendant told him that he had to pay taxes on his drug sales to the Norteño gang. R. did not comply. He testified that he had never heard of Norteño gang members paying taxes

3

to the gang. R. believed defendant and Eales, who was apparently with defendant when this demand was made, "were jealous" that he was "getting money," and wanted "to get theirs, too."

On the night of May 18, 2016, while R. was playing dice in front of his house, defendant and Eales robbed and assaulted him. The incident was captured by a surveillance camera positioned on the house across the street. The owner of that house also saw the assault as it happened, but did not call the police because he often saw people fighting in his neighborhood. The surveillance video shows R. falling to the ground after being punched by defendant, who then repeatedly punched and kicked R. while he was on the ground. During the assault, Eales reached into R.'s pants pockets and took a substantial amount of money from him.

Defendant and Eales left the scene after committing these crimes. The video then shows R. struggling to get up off the ground, stumbling across his driveway and into an adjacent alley, and then collapsing on the ground. Sometime later, R. was transported to the hospital, where he spent more than two weeks recovering from his injuries.

R. identified defendant in a photo lineup as having been one of the perpetrators of the assault and robbery. The neighbor across the street also identified defendant in a photo lineup as the person punching R. repeatedly in the video. He saw him a couple times before in the neighborhood. Two other neighborhood residents also identified Eales in the video as the other perpetrator.

Additional evidence supporting the gang enhancements will be set forth in the discussion portion of this opinion.

DISCUSSION

I

*The Firearm Enhancement*

Defendant contends we must strike the 20-year firearm enhancement attached to count one because violation of section 246 is not included in the list of offenses to which

4

a section 12022.53, subdivision (c) enhancement applies. The Attorney General concedes the issue. We accept the concession.

In count one, defendant was charged with discharging a firearm at an inhabited dwelling in violation of section 246. The prosecution also alleged he personally and intentionally discharged a firearm within the meaning of section 12022.53, subdivision (c). The jury found defendant guilty and found this enhancement allegation to be true. The trial court imposed a sentence of 14 years for the conviction (upper term of 7 years, doubled because of the prior strike conviction) plus 20 years for the enhancement.

Section 12022.53, subdivision (c) provides: "Notwithstanding any other law, a person who, *in the commission of a felony specified in subdivision (a)*, personally and intentionally discharges a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 20 years." (Italics added.) Violation of section 246 is not a felony specified in section 12022.53, subdivision (a). Accordingly, as the Attorney General concedes, the 20-year term imposed pursuant to this subdivision must be stricken.[2]

## II

### *Sufficiency of the Gang Evidence*

Defendant also challenges the sufficiency of the evidence supporting the gang enhancements attached to counts five and six. We assess the sufficiency of the evidence based on the law existing at the time of trial (see *Sek*, *supra*, 74 Cal.App.5th at p. 669;

---

[2]    As the Attorney General also notes, the section 12022.53, subdivision (d) enhancement applies not only to the "commission of a felony specified in subdivision (a)," but also to "[s]ection 246" and certain subdivisions of section 26100, i.e., discharging a firearm from a motor vehicle. However, this enhancement, which requires "great bodily injury . . . or death" (§ 12022.53, subd. (d)), was not alleged against defendant in this case.

*People v. Figueroa* (1993) 20 Cal.App.4th 65, 71-72), and conclude substantial evidence supports the enhancements.

" 'In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." [Citation.]' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

At the time of defendant's trial, section 186.22, subdivision (b)(1) provided in relevant part: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony . . . be punished as follows: [¶] . . . [¶] (C) If the felony is a violent felony . . . the person shall be punished by an additional term of 10 years." (Former § 186.22, subd. (b)(1); Stats. 2017, ch. 561, § 178.)

We described the "criminal street gang" requirements, as they existed at the time of defendant's trial, in *People v. Cornejo* (2016) 3 Cal.App.5th 36 (*Cornejo*): " 'To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and

6

(3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]' [Citations.] 'A "pattern of criminal gang activity" is defined as gang members' individual or collective "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated "predicate offenses" during a statutorily defined time period. [Citations.] The predicate offenses must have been committed on separate occasions, or by two or more persons. [Citations.]' [Citations.]" (*Id.* at p. 47.)

To satisfy these "criminal street gang" requirements, the prosecution's gang expert, Detective John Sample, testified regarding the historical origins of the Norteño gang, the roughly 1,500 Norteño gang members in the Sacramento area, divided into various subsets largely based on geographical location, the Norteño gang's chosen color (red) and symbology (e.g., the letter N and number 14), as well as the gang's violent rivalry with the Sureño gang. Detective Sample also testified that the Norteño gang is unified and hierarchical within the prison system, with an "Authority in Charge" or "AIC," as the detective put it, "basically the person who is directing the Norteños that are programming in custody."[3] Outside of prison, different Norteño subsets routinely work together to commit crimes, but certain subsets also feud from time to time.

As mentioned, defendant was a member of the VDS subset of the Norteño gang. Eales was a member of the VGL subset.[4] Detective Sample, after testifying that he was

---

[3] Detective Sample further explained that "programming" was a term Norteños used to describe "basically follow[ing] the structure" laid out by the AIC, whether that meant participating in workouts or engaging in other actions on behalf of the gang, such as transporting drugs, imposing punishment on someone who was placed on a "bad news list" for "snitching" or some other affront to the gang, or passing along such information in "kites or huelas," a secretive "micro scroll" form of writing.

[4] We need not delineate the evidence establishing their membership in these subsets because defendant does not challenge the sufficiency of the evidence in this regard. It

personally familiar with three or more members of each of those subsets, further testified that those subsets are part of the greater Norteño gang, the primary activities of which are narcotics sales, robbery, burglary, various types of shootings, attempted homicide, and assault with a firearm. With respect to the pattern of criminal gang activity requirement, Detective Sample testified to the facts of two predicate offenses. In the first, Rodney Lopez, a member of Eales's subset, VGL, was convicted of assault with a firearm and narcotics sales. In the second, Christopher Shultz, a member of defendant's subset, VDS, and Christopher Treadway, a member of the Varrio Franklin Boulevard (VFB) subset, were convicted of shooting at an occupied establishment and possession of a firearm by a convicted felon.

Defendant argues the foregoing evidence is not sufficient to establish that either his subset, VDS, or Eales's subset, VGL, or any greater Norteño gang in the Sacramento area, qualified as a "criminal street gang" as that statutory phrase was interpreted by our Supreme Court in *People v. Prunty* (2015) 62 Cal.4th 59. We are not persuaded.

In *Prunty*, "the prosecution's gang expert testified to two predicate offenses committed by members of two Norteño subsets, neither of which was the same subset to which the defendant belonged. The only evidence indicating these subsets 'identified with a larger Norteño group' was the expert's testimony that they all 'referred to themselves as Norteños.' [Citation.] This, the court held, was not enough to show the Norteño gang the defendant sought to benefit by committing his crimes was the same Norteño gang that committed the predicate offenses. [Citation.] Instead, the prosecution was required to prove 'some associational or organizational connection uniting those subsets.' [Citation.] The court continued: 'That connection may take the form of evidence of collaboration or organization, or the sharing of material information among

will suffice to state that the evidence of both defendants' status as Norteño gang members is overwhelming.

8

the subsets of a larger group. Alternatively, it may be shown that the subsets are part of the same loosely hierarchical organization, even if the subsets themselves do not communicate or work together. And in other cases, the prosecution may show that various subset members exhibit behavior showing their self-identification with a larger group, thereby allowing those subsets to be treated as a single organization. [¶] Whatever theory the prosecution chooses to demonstrate that a relationship exists, the evidence must show that it is the same "group" that meets the definition of section 186.22[, subdivision ](f)—i.e., that the group committed the predicate offenses and engaged in criminal primary activities—and that the defendant sought to benefit under section 186.22[, subdivision] (b).' [Citation.]" (*Cornejo*, *supra*, 3 Cal.App.5th at p. 48, fn. omitted.)

Here, the Norteño gang defendant sought to benefit by robbing and assaulting R. must have included at least the VDS and VGL subsets because he and Eales, "OG" members of those subsets, united together to commit the crimes in this case. That same group, i.e., the portion of the greater Norteño gang in Sacramento that includes both the VDS subset and the VGL subset, engaged in the criminal primary activities to which Detective Sample testified, and also committed the predicate offenses, a member of VGL having committed the first predicate offense and a member of VDS having committed the second such offense, along with a member of VFB. No more was required at the time of defendant's trial.

Defendant also challenges the sufficiency of the evidence to establish that he "specifically intended to benefit the Norteño gang by robbing [R.]" We conclude the evidence was more than sufficient to prove this element of the enhancement. The evidence established that defendant, a longtime VDS gang member, together with Eales, a longtime VGL gang member, assaulted and robbed R. because he refused to pay taxes to the larger Norteño gang. R. testified that defendant told him that he had to pay taxes on his drug sales to the Norteño gang. He was assaulted and robbed when he did not

9

comply. The inference that this was the reason for the assault and robbery is inescapable. Nor does it matter that R. also testified that he had never heard of Norteño gang members paying taxes to the gang. Detective Sample testified that he had spoken to Norteño gang members who confirmed such tax-paying arrangements occurred, although not every subset participated. The evidence also established that the larger Norteño gang asserted its presence in the jail system and committed criminal activity, such as drug sales, in the jails. After defendant's arrest in this case, he became the AIC of his housing unit. So did Eales. Indeed, Eales was caught with drugs and numerous huelas delineating who could sell drugs in the jail and discussing the payment of taxes. From this evidence, a reasonable jury could have concluded defendant committed the crimes for the benefit of the Norteño gang because he sought to compel another Norteño gang member to participate in the tax system commonly practiced among Norteño street-level subsets and also discussed in jail-level Norteño huelas.

The gang enhancements are supported by substantial evidence.

### III

### *Retroactive Application of Assembly Bill 333*

Finally, defendant asserts Assembly Bill 333 applies retroactively to his case and requires us to strike the gang enhancements. We agree.

As stated previously, Assembly Bill 333 "amended section 186.22 to impose new substantive and procedural requirements for gang allegations." (*Sek*, *supra*, 74 Cal.App.5th at p. 665.) Under the new law, "to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).) Additionally, "the law created a stricter requirement for proof of 'a pattern of criminal gang activity,' which is necessary

10

to prove that the group with which the defendant is associated is indeed a criminal street gang.  (§ 186.22, subd. (f).)  Previously, the prosecution needed to prove only that those associated with the gang had committed at least two offenses from a list of predicate crimes on separate occasions within three years of one another.  (See former § 186.22, subd. (e).)  Under the newly amended law, the offense with which the defendant is currently charged cannot be used as one of the two predicate offenses.  (§ 186.22, subd. (e)(2).)  In addition, both predicate offenses must have been committed 'within three years of the date the current offense is alleged to have been committed,' by gang 'members,' and must have been for the 'common[ ] benefit[ ] [of] a criminal street gang.' (§ 186.22, subd. (e)(1).)  Finally, under [Assembly Bill 333], the defendant may request a bifurcated trial, in which the defendant is first tried for the underlying offense, and only upon conviction is tried for any gang enhancements.  (§ 1109, subd. (a).)"  (*Sek,* at p. 665.)

Assembly Bill 333 applies retroactively to this case (*Sek*, *supra*, 74 Cal.App.5th at pp. 666-667), as the Attorney General concedes.  The Attorney General nevertheless argues we may uphold the enhancement findings because the "compelling evidence supporting the gang-related enhancements" supports a finding "beyond a reasonable doubt that the jury would have found [them] to be true even under [the] more stringent new requirements."  We are not persuaded.

In rejecting the Attorney General's argument, we need only discuss the new requirement that the benefit to the gang must be more than reputational.  This "essentially adds a new element to the enhancement," making the instructions given to the jury in this case "deficient for omitting an element of an offense."  (*Sek*, *supra*, 74 Cal.App.5th at p. 668.)  Such an error "implicate[s] the defendant's federal constitutional rights, and we review for harmless error under the strict standard of *Chapman v. California* (1967) 386 U.S. 18. . . . Under the *Chapman* standard, reversal is required unless 'it appears beyond

11

a reasonable doubt that the error did not contribute to th[e] jury's verdict.' [Citation.]" (*Ibid.*)

Here, when asked what benefit would come to the gang in assaulting someone for not paying taxes, Detective Sample answered: "Well, Norteño gang members are known for violence. They – they obtain fear through multiple ways; threats, actual physical violence. That reputation for violence assists them in situations like collecting taxes and that reputation." The detective continued: "I think collecting taxes is beneficial in a couple of ways. You obviously have the financial benefit of the taxes itself, but it's also furthering that reputation of this is who we are, and this is our reputation; the only reason you should pay us taxes is based on our reputation and the reach that we have." In apparent response to R.'s suggestion that defendant and Eales might have robbed him in order to take the money for themselves, and not for the benefit of the Norteño gang, the prosecutor asked the detective: "And would it be possible . . . that someone might say they're collecting taxes for the Norteño gang, and they might pocket the money after they do so[?]" Detective Sample answered in the affirmative, but still maintained this would benefit the gang: "Again, there would still be the individual benefit for that money for those individuals, but their reputation, the violent act that goes with that tax collection, the robbery, and the word of mouth that spreads with that reputation of tax collection I think would still benefit through that enhanced reputation, and the fear that would derive from that." In response to a hypothetical tracking the facts of this case, the detective again noted "the entire gang of Norteños that [defendant and Eales] represent are more feared for this becomes their pattern and their reputation for violence for others to know."

Thus, in addition to the reputational benefit, Detective Sample testified to one benefit of the assault and robbery that was "more than reputational," specifically, "financial gain." (§ 186.22, subd. (g).) The Attorney General suggests there is another, "retaliation" (*ibid.*) against R. for not paying up when asked. We acknowledge there is substantial evidence supporting these as more than reputational benefits to the gang.

12

However, "in order to prove harmless error under the *Chapman* standard, it is not enough to show that substantial or strong evidence existed to support a conviction under the correct instructions. As the United States Supreme Court explained in *Sullivan v. Louisiana* (1993) 508 U.S. 275, 'the question . . . is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand. . . . The inquiry, in other words, is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' [Citation.]" (*Sek*, *supra*, 74 Cal.App.5th at p. 668.) We cannot so conclude on this record. As in *Sek*, where the gang expert also "testified about several ways in which a crime could benefit a criminal street gang, but one of these was reputational[,] . . . we cannot rule out the possibility that the jury relied on reputational benefit to the gang as its basis for finding the enhancements true." (*Id*. at p. 669.)

The gang enhancements attached to counts five and six must be stricken. Retrial is permitted, however, because these enhancements were supported by substantial evidence under the law that existed at the time of trial. (*Sek*, *supra*, 74 Cal.App.5th at p. 669.)

## DISPOSITION

The firearm enhancement attached to count one is stricken. The gang enhancements attached to counts five and six are also stricken and the jury's findings that those offenses were committed for the benefit of a criminal street gang are reversed. In all other respects, the judgment is affirmed. The People shall have 60 days from the date of the remittitur in which to elect to retry defendant on the gang enhancements. At the conclusion of such a retrial, or if the People elect not to retry defendant on the gang

enhancements, the trial court shall resentence defendant and forward an amended abstract of judgment to the appropriate authorities.

                                                     /s/
                                                     HOCH, J.

We concur:

 /s/
MAURO, Acting P. J.

 /s/
BOULWARE EURIE, J.

14